NEWMAN and others *vs.* ALVORD & BAILEY.

The plaintiffs were engaged in the business of manufacturing cement, or water-lime, from quarries or beds lying near Akron, Erie county, designated and sold as " Akron Cement," and " Akron Water Lime," the packages containing the same, when sold and offered for sale, having attached to each of them these words : "Newman's Akron Cement Co., Manufactured at Akron, N. Y. The Hydraulic Cement known as the Akron Water Lime." The defendants being engaged in manufacturing and selling a similar article from quarries or beds situated near Syracuse, Onondaga county, and knowing that water lime cement was manufactured and sold by the plaintiffs under the name of " Akron Water Lime," and " Akron Cement," called their own beds the " Onondaga Akron Cement and Water Lime," and after that, they sold the water lime and cement, prepared by them, with a label on each package, having these words upon it : " Alvord's Onondaga Akron Cement, or Water Lime, Manufactured at Syracuse, New York;" such water lime and cement being placed upon the market, and sold in the same places, where that manufactured by the plaintiffs was sold and used. *Held*, that the word " Akron," as used by the plaintiffs, was their trade-mark, by which they designated the article manufactured and sold by them ; and that they were entitled to be protected in such use of it, by an injunction restraining the defendants from making use of the word " Akron" as their trade-mark.

*Held, also*, that the case was not one of such doubt as to require the plaintiffs' right to be first established at law.

*Held, further*, that to defeat the plaintiffs' right to appropriate the term " Akron," on the ground that it had previously been in common use, such a use of it must be shown as would extend to and include the defendants. That until that was done, the use made of it by the plaintiffs might well be exclusive of the defendants without being so as to the inhabitants of Akron.

THE plaintiffs, in this action, are manufacturers of cement, or water lime, at the village of Akron, in the county of Erie. And the defendants are engaged in the same business at Syracuse, in the state of New York. Two of the plaintiffs have carried on the business at Akron, for about thirteen years preceding the trial of this action, and they, together with the other two plaintiffs, have carried on the same business for three years preceding such trial. During all that time their cement, or water lime, has had an extensive sale at Buffalo and other places, in the country, bringing a high price, and being regarded as a superior article. The cement, or water lime, manufactured by them, has been designated

and sold, during all the time of its manufacture, as " Akron Cement," and " Akron Water Lime." And the packages containing the cement, sold and offered for sale, had attached to each of them a label having the following words upon it :

" Newman's Akron Cement Co. Manufactured at Akron, N. Y. The Hydraulic Cement, known as the Akron Water Lime."

The defendants, Earle B. Alvord, Alvord & Bailey, and the defendants under the name of E. B. Alvord & Co., had been engaged in the manufacture and sale of cement, or water lime, for eleven or twelve years preceding the trial. The plaintiffs manufactured their cement from stone taken from quarries or beds lying between half a mile and a mile from the village of Akron. And the lime manufactured from such beds has been called " Akron Water Lime," or " Akron Cement," during all the time of its manufacture, both by the plaintiffs and their predecessors, and also by other persons manufacturing and selling the same. The defendants, and those previously engaged in the same business, manufactured their cement, or water lime, from quarries or beds situated near Syracuse, in Onondaga county. And from the time of the formation of the firm constituted by the defendants, on the first of January, 1866, they called these beds the " Onondaga Akron Cement and Water Lime," and after that, they sold the water lime and cement, prepared by them, with a label on each package containing it, having the following words upon it :

" Alvord's Onondaga Akron Cement, or Water Lime. Manufactured at Syracuse, New York."

At the time when the name was given to the defendants' lime beds, near Syracuse, they knew that the water lime cement was manufactured and sold by the plaintiffs under the name of " Akron Water Lime," or " Akron Cement." And that which the defendants manufactured was placed upon the market, and sold in the same places, where that manufactured by the plaintiffs was sold and used.

There is but one process for manufacturing water lime cement, and that is, by burning and grinding the stone. Its quality and character depends upon the stone, or beds, from which it may be made. No place in the state of New York, except this village, in the county of Erie, is called by the name of " Akron."

Upon these facts, the court before which the action was tried, found and decided that the word " Akron," as used by the plaintiffs, was their trade-mark, by which they designated the article manufactured and sold by them; and that they were entitled to be protected in such use of it. And that the defendants had adopted it for the purpose of increasing their own sales, availing themselves of the reputation acquired by the water lime manufactured by the plaintiffs, and to secure to themselves a higher price for the article manufactured by them. Judgment was directed perpetually enjoining the defendants from using the word " Akron" on their bills and labels, or in any other way in connection with their business of manufacturing or selling cement or water lime, or in furnishing the same for sale ; or in designating their quarry or mill. The defendants excepted to the decision of the court ; and from the judgment entered upon it, brought the present appeal.

*George N. Kennedy,* for the appellant.

*John Ganson,* for the respondent.

*By the Court,* DANIELS, J. The name which has been selected and used for the purpose of distinguishing the water lime cement manufactured by the plaintiffs from that manufactured by others engaged in the same business, is one which is very clearly adapted to that purpose ; because it designates the origin of the article made and dealt in by them, as well as its place of manufacture. Within the settled rule of the law governing trade marks, it was appropriately used in these

Newman *v.* Alvord.

respects ; for the material used by the plaintiffs was obtained and manufactured into water lime cement at the village having that name. To that extent they are within the protection of the principle sustained by all the cases decided on this subject. (*Stokes* v. *Landgraff*, 17 *Barb.* 608. *Corwin* v. *Daley*, 7 *Bosw.* 222. *Fetridge* v. *Wells*, 4 *Abb. Pr.* 144. *Amoskeag Manufacturing Co.* v. *Spear*, 2 *Sandf.* 599. *Clark* v. *Clark*, 25 *Barb.* 79.)

But the more important question arising upon the facts in this case is whether the plaintiffs can properly be protected in their use of that word, under the settled rules of law relating to the appropriation and use of words as trade marks. Where words, or names, are in common use, the law does not permit such an appropriation of them to be made, so far as they are comprehended by such use. And for that reason, words and names having a known or established signification cannot, within the limits of such signification, be exclusively appropriated to the advancement of the business purposes of any particular individual, firm or company. The inability to make such appropriation of them arises out of the circumstance that on account of their general or popular use, every individual in the community has an equal right to use them ; and that right is, in all cases, paramount to the rights and interests of any one person, firm or company. What may alike be claimed and used by all, cannot be exclusively appropriated to advance the interests of any person. Numerous cases have been before the courts in which this limitation upon the use of words and names as trade marks has been maintained and established. And no good reason can be given for questioning or impeaching their conclusions. But while this limitation is entirely reasonable there can be no propriety in extending it beyond the circumstance upon which it is founded. And accordingly any member of the community whose interests and business may be promoted by doing so, should be at liberty to apply even names and words in common use to the products of his industry, in such a man-

ner as to indicate their origin or particular manufacture, where such application will not intrench upon and be in no way included in their use by the public. By doing so, the rights of no member of the community can be in any manner infringed, and no public inconvenience whatever can be occasioned by it. The public will still be left at full liberty to use such words or terms as they were used before ; while for a special purpose, a new office or purpose may be imposed upon them. In cases of that description no greater inconvenience or embarrassment can be found in protecting parties in the enjoyment of the new use or purpose engrafted upon a popular term than has been found in extending that protection to the case of a word created for the occasion, which was done in the case of *Burnett* v. *Phalon,* (9 *Bosw.* 192.)

The cases which have sometimes been supposed to come in conflict with this use and appropriation of popular terms will be found, upon examination not to be so. In those of *Burgess* v. *Burgess,* (17 *Eng. Law and Eq.* 257,) and *Wolf* v. *Goulard,* (18 *How. Pr.* 64,) the popular use and signification of the terms used was attempted to be appropriated, which, under the principles already adverted to, the court very properly held could not be done. Such also were the cases of *Corwin* v. *Daley,* (7 *Bosw.* 222,) where the plaintiff endeavored to appropriate the terms " Club House Gin," and of *Bininger* v. *Wattles,* (28 *How. Pr.* 206,) where the terms used were of a similar nature, being " Old London Dock Gin." These were terms in popular use for the particular purpose of describing the subjects the plaintiffs claimed the right to specifically appropriate them to. But neither of these decisions nor any others which they refer to, sanction the conclusion that because a term is in popular use, it can be burthened with no new one of a special and exclusive character for the purpose of identifying the trade and manufactures of a particular individual. What has been said by the courts upon this subject will be found to relate to such uses of pop-

ular terms as are properly included within their usual and appropriate public meaning.

The object of the law, in cases of this description, is to restrain and prevent fraud upon the manufacturer, and imposition upon the public. And that object would be entirely defeated, in many cases, if courts of justice were bound to withhold their protection from persons who imposed a new office and signification upon an old word for the purpose of rendering it serviceable as a trade mark. There is no more reason for allowing a person's business to be laid open to the fraudulent invasions and misrepresentations of competing manufacturers and dealers in such a case, than there would be where the term was entirely new and previously unused. Where one person by means of superior skill, intelligence and industry, has created a valuable trade for his goods or wares in the market, and identified such trade by the appropriate use of terms, labels or devices, the party who simulates those terms, labels or devices for the purpose of diverting or securing the trade to himself, is guilty of a double fraud upon the person creating the trade, and also upon the public. The man who goes upon the market in that manner, substantially represents that the goods or wares which he offers for sale are those of the person who first secured the public confidence for them. And the act embodies all the essential elements of fraud. Justice Duer says : " The essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another. And it is only when this false representation is directly or indirectly made, and only to the extent to which it is made, that a party who appeals to the justice of the court can have title to relief." (2 *Sandf.* 607.) And the same principle is stated by the chancellor in *Farina* v. *Silverlock*, (39 *Eng. Law and Eq.* 514.) The same learned justice, in the case already mentioned, perspicuously states the general rule applicable to cases of this description. He says : " Every manufacturer, and every merchant for whom

goods are manufactured has an unquestionable right to distinguish the goods he manufactures or sells, by a peculiar mark or device, in order that they may be known as his in the market for which he intends them, and that he may thus secure the profits that their superior repute as his may be the means of gaining. And the only limitation imposed upon him in doing so is, that he shall not "appropriate a sign or symbol which, from the nature of the fact which it is used to signify others may employ with equal truth, and therefore have an equal right to employ, for the same purpose," (2 *Sandf.* 605, 6;) which it is obvious could not be the case where the use made of a popular term was such as to devote it to a new office and purpose, and invest it with a new signification. These others could not employ it in the same manner with equal truth, nor with any semblance, even the most remote, to the truth. In that case, and to that extent, the use made of the word as a trade mark would not be obnoxious to the objection that it was an attempt to appropriate to a private purpose what already belonged to the public at large.

This appropriation or use of terms of a public nature, is sustained by well considered and well established authorities. In the case of *Knott* v. *Morgan*, (2 *Keen*, 213,) the plaintiff was a shareholder in a company having and running public omnibuses, with the title painted upon them of "London Conveyance Company," which was imitated by the defendants upon similar omnibuses used by them. And that imitation was restrained by injunction. In the course of his decision upon that case, Lord Langdale said : "It is not to be said that the plaintiffs have an exclusive right to the word "Conveyance Company," or "London Conveyance Company," or any other words. But they have a right to call upon this court to restrain the defendant from fraudulently using precisely the same words and devices, which they have taken for the purpose of distinguishing their property, and thereby

depriving them of the fair profits of their business, by attracting custom on the false representation that omnibusses owned by the defendants, belong to, and are under the management of, the plaintiff." And in that case an injunction was issued which restrained the defendants from using those terms, or any other names, words or devices painted, stamped, printed or written on their omnibuses in such a manner as to form or be a colorable imitation of the names, words and devices used by the plaintiffs. And on appeal, this decision was affirmed. The same doctrine was again declared by the same learned judge, in the case of *Croft* v. *Day*, (7 *Beav.* 74.) He there stated the law to be that " the right which any person may have to the protection of this court does not depend upon any exclusive right which he may be supposed to have to a particular name or form of words. His right is to be protected against fraud, and fraud may be practised by means of a name, though the person practising it may have a perfect right to use that name, provided he does not accompany its use with such other circumstances as to effect a fraud upon others." Which is approvingly cited by ROBERTSON, Justice, in *Corwin* v. *Daly*, (7 *Bosw.* 227,) and by the vice-chancellor, in *Collins* v. *Cowen*, (3 *Kay & John.* 428.) And the case of *Howard* v. *Henriques*, (3 *Sandf.* 727,) sustains and maintains the same conclusion. In the case of *Williams* v. *Johnson*, (2 *Bosw.* 1,) the court seemed inclined, rather hesitatingly, to hold that the plaintiff should be protected in the use of the appellation of " Genuine Yankee Soap." But in the case of *Williams* v. *Spence*, (25 *How. Pr.* 366,) full protection by injunction appears to have been awarded for it. In *Taylor* v. *Carpenter*, (11 *Paige*, 292,) the terms which the plaintiff had selected and used to distinguish his manufacture of thread from that of others, were " Taylor's Persian Thread," and he was protected in such use and appropriation by an injunction against a similar use of them by the defendant. And the decree awarding that injunction was affirmed by the Court of Errors. (2 *Sandf. Ch.*

603.) This certainly should·be a sufficient authority for the appropriation of well known terms to the purposes of manufacture and trade, and for the protection of it by injunction ; where the appropriation consists in affixing a· new use, or office, or such terms no way disturbing or affecting the previous public use of them. Upon a similar state of facts, a bill was sustained in the United States Circuit Court, and Judge Story awarded an injunction of the same extended nature. (*Taylor* v. *Carpenter*, 3 *Story*, 458.) A similar bill was afterwards filed in the English Court of Chancery against a defendant whose name was Taylor, and that court restrained him from using the phrase " Taylor's Persian· Thread," as descriptive of the thread he offered to the public and sold. (*Taylor* v. *Taylor*, 23 *Eng. Law and Eq.* 281.) And the same thing has been done where common terms have been combined with new devices, and the entire combination made use of as a trade-mark.

The cases of *Singleton* v. *Bolton*, (3 *Doug.*·293,) and *Millington* v. *Fox*, (3 *Mylne & Craig*, 338,) arose upon attempts made to acquire the exclusive use of popular names by which alone the articles compounded were known, and they have for that reason no application to the present controversy. In that respect they are something like the case of *Burgess* v. *Burgess*, *Corwin* v. *Daly*, and *Bininger* v. *Wattles*, *supra*, where the names claimed as trade-marks were the names by which the articles had been previously known in the market ; and in the two latter they indicated the quality only. The case of *Perry* v. *Puffit*, (6 *Beavan*, 66,) was disposed of upon the fact that the name used by the defendant was just as true in the application made of it by him as it was as used by the plaintiff ; while *Fetridge* v. *Wells*, (13 *How. Pr. R.* 385,) *Partridge* v. *Menck*, (2 *Barb. Ch.* 101,) and *Pidding* v. *Howe*, (8 *Sim.* 477,) were dismissed because the terms and phrases the plaintiffs endeavored to appropriate were not true, but on the other hand were unfounded and deceptive, and in no way

related to the origin or manufacture of the articles to which they were applied.

In the present case, the term selected to identify and distinguish the plaintiffs' manufacture from those of a similar character placed upon the market by others had never been previously used for any such purpose. That use of it imposed a new attribute or office upon the word, which specially adapted it to indicate and distinguish the origin and place of the plaintiffs' manufacture. And it in no way intrenched upon any previous use or purpose to which the term had been in any way devoted by others. The term was made to bear and perform an entirely new duty, or office, which could result in no embarrassment, prejudice or injury to any other person whatsoever. And from the continued use made of it in that respect it has become an important and valuable element in promoting and securing the property and profit of the plaintiffs' business, and as such the defendants would be restrained from making a similar use of it.

It is not necessary, in disposing of the present controversy, to make it entirely dependent upon the considerations previously suggested. For the term appropriated to the business of the plaintiffs is not one of those which all alike are equally entitled to make use of. Its common use is not shown to have extended beyond the inhabitants of the village known by it. And neither of them appear to contest the plaintiffs' right to use it as a designation of the article they manufacture and sell. If any persons are entitled to complain of the use made by the plaintiffs of the term, they, certainly, are the ones to do it; not the defendants, who are neither inhabitants of, nor interested in, any of the concerns of the village. The doctrine of the case of *The Brooklyn White Lead Company v. Masury,* (25 *Barb.* 417,) does not aid the defendants, in this respect. For while it maintains the right of all the inhabitants of that particular place to call their white lead Brooklyn white lead, it does not hold that any person not an inhabitant of Brooklyn would have the same right.

On the contrary, the principle adopted in that decision maintains the right as a common privilege appertaining to persons manufacturing white lead in the city of Brooklyn, and nothing whatever beyond that. If the conclusion of the court in that case is to be fully sustained, it will go no further than to entitle all persons· manufacturing water lime cement at Akron to designate and describe it as Akron water lime, or Akron cement, which would in no way assist the defendants in their present defense. To defeat the plaintiffs' right to appropriate the term, on the ground that it has been in common use, such a use of it must be shown as will extend to and include the defendants. Until that is done, the use made of it by the plaintiffs may well be exclusive of the defendants without being· so as to the inhabitants of the village of Akron.

The use of this word by the defendants, under the circumstances disclosed by the evidence, creates a very strong presumption that it was adopted for the purpose of diverting a portion of the plaintiffs' trade to themselves, and in that way. securing the gains and profits which justly the plaintiffs are entitled to. No other reason appears to exist for applying the name of "Akron" to their lime beds and incorporating it in the labels placed upon the barrels in which the sale of their cement. is offered and made. No circumstance can be reasonably and fairly suggested for these changes in the defendants' business which were not made before the 1st of January, 1866, although the same business had been carried on for many years before that, unless it be the one already mentioned. And the defendants should not now be permitted to successfully allege that they did not intend, by doing· so, to mislead or deceive the public ; nor that the public could not well be deceived by what they have done. There is no room for doubt but that this name was used by them to. enable them to avail themselves of the patronage they suspected might otherwise go to the plaintiffs ; and they probably correctly judged that such would be the result. The

law would certainly be in fault if it should allow that to be secured, by the means resorted to in this instance. The case, in this respect, is directly within the conclusion of Judge Duer in *Amoskeag Manf. Co.* v. *Spear,* (2 *Sandf.* 607,) where he says: "It is evident, however, that in order to convey a false impression to the mind of the public as the true origin of the manufacture of goods, it is not to necessary that the imitation of an original trade mark shall be exact, or perfect. It may be limited or partial. It may embrace variations that a comparison with the original would instantly disclose. Yet a semblance may still exist that was designed to mislead the public, and the effect intended may have been produced. Nor can it be doubted that whenever this design is apparent, and this effect has followed, an injunction may rightfully be issued, and ought to be issued." The case is not one of such doubt as to require the plaintiffs' right to be first established, at law, within the rule applied to cases of doubtful character. (*Partridge* v. *Menck,* 2 *Barb. Ch.* 103.) The plaintiffs' right to restrain the defendants from making use of the word "Akron" as their trade mark is reasonably plain, and the judgment awarding the injunction should therefore be affirmed.

[ERIE GENERAL TERM, September 2, 1867. *Marvin, Daniels* and *E. Darwin Smith,* Justices.]