IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1889.

## APPEAL OF DANIEL LAUGHMAN ET AL.

[PIPER ET AL. v. LAUGHMAN ET AL.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 3 OF PHILADELPHIA COUNTY, IN EQUITY.

Argued January 31, 1889—Decided October 7, 1889.

[To be reported.]

1. The ownership of the trade-name of a natural or the trade-mark of a manufactured product, is a right of property which equity will protect from infringement without requiring proof that its adoption or imitation by others was intentionally fraudulent, provided that such adoption or imitation amounted to a false representation, expressed or implied.

2. While the right to use a trade-mark or trade-name may not be the subject of sale as a distinct and separate property, it is capable of assignment in connection with the business in which it is used, and will pass by a transfer of the business unless reserved: a similar rule applies to a sale by one partner to his copartners of his interest in a firm.

3. The office of a trade-mark or trade-name is to indicate the personal origin or source of the article to which it is affixed or applied, and thus identify such article and distinguish it in the market from other articles of a similar nature, and no property can exist in a word, or symbol, which has no relation to the origin or ownership of the goods, but merely indicates their name or quality.

4. A merely geographical name, designating a district of country, cannot be appropriated as a trade-name for articles manufactured or produced within that district, so as to exclude other persons in the same district

Statement of Facts.

from truthfully using the same designation to indicate the local origin of similar articles manufactured or produced by them.

5. When a large tract of coal land has become known by the name of the original patentee, and, although it may not present the features of an independent region and have sharply defined natural boundaries, or constitute a separate coal basin, or even sub-basin, it yet has received distinct geographical recognition from the public, its recognized name becomes a geographical one as applied to its coal product.

6. The name of a private estate may, in general, be used by the owner as a trade-name; but the name by which a large patent tract, containing a number of separate private estates, owned by different persons, engaged in mining and shipping coal, is generally known in the geography of the country, is not the name of a private estate in the sense of this rule, and one of these owners cannot assume it as a trade-name, to the exclusion of the others.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 87 January Term 1889, Sup. Ct.; court below, No. 427 September Term 1884, C. P. No. 3, in Equity.

To the number and term of the court below, William H. Piper and John H. Lewars, trading as W. H. Piper & Co., filed a bill in equity against Daniel Laughman and J. Chester Wilson, trading as D. Laughman & Co., averring:

That in 1874, W. H. Piper, one of the plaintiffs, became associated with James H. Dysart and Daniel Laughman, one of the defendants, under the firm name of Dysart & Co., in carrying on the business of mining and shipping coal upon a tract of land in Cambria county, Pa., known as the Sonman Survey; that this firm adopted the name of "Sonman Coal" as a distinctive name and trade-mark for their coal, by which it had become known in the market, acquiring a high reputation; that on July 26, 1879, said firm was dissolved, Dysart and Laughman assigning all their interest to Piper, who on August 1, 1879, associated John H. Lewars with him in carrying on the same business, under the firm name of W. H. Piper & Co., and said firm of Piper & Co. thus became invested with all the property and rights of the former firm of Dysart & Co. including the right to the use of the word Sonman as a trademark; that plaintiffs had at great expense advertised their product as Sonman coal; that about the year 1879, the defendants had begun to operate a colliery in the neighborhood of

that of the plaintiffs, which produced coal of the same general appearance but of inferior quality, and, in order deceptively to impose their coal upon the public, were fraudulently using the plaintiffs' trade-mark and advertising and offering their own coal as Sonman coal, and refused to desist therefrom upon request so to do, to the great injury of the complainants and the detriment and deception of the public. The plaintiffs wherefore prayed for an answer from defendants, for an injunction restraining the sale of defendants' coal under the name of Sonman coal, for an account of profits realized by defendants from the use of plaintiffs' trade-mark, and for general relief.

To this bill the defendants made answer denying that Dysart and Laughman ever transferred to W. H. Piper any rights they possessed concerning the use of the word Sonman as applied to coal; or that the name Sonman was first used as a distinctive name for the coal at or after Piper became a member of the firm of Dysart & Co., or that said firm were the first to adopt and apply said name to coal: but averring that this name had been used by the Cambria Mining and Manufacturing Company for coal mined and sold by it in 1871 and 1872; that in 1873 Dysart & Co. had used this name; that in 1878 a circular advertisement was issued by Dysart & Co., under the direction of said Piper, calling their coal "The Sonman Bituminous Clearfield coal;" that the coal of plaintiffs was not universally known as Sonman coal, but the coal of this vein was more generally known as Clearfield, and was sold, especially in western markets, under the name of Blossburg coal; that the name Sonman was a geographical name, well known since the settlement of that section, being first applied to a large tract of land granted by William Penn to Arent Sonman, and afterwards to a post-office, a railroad station, a telegraph office and a village located thereon: admitting the advertising and selling of defendant's coal as Sonman coal and their refusal to desist therefrom, but averring that it was Sonman coal and denying that they had ever deceived or tried to deceive the public, and also denying any exclusive right in the plaintiffs to the use of this name. As a further defence, the answer averred that the plaintiffs did not come into court with clean hands, being engaged in falsely selling, under the name of Sonman a coal mined at Lilly Station, about four miles from Sonman station, and of greatly inferior quality.

Statement of Facts.

After issue joined the case was referred to *Mr. Charles F. Corson*, as examiner and master, who returned a large amount of testimony and reported thereon the following

### FINDINGS OF FACT.

That plaintiffs and defendants are miners and shippers of bituminous coal, the former having their office in the city of Philadelphia, and the latter having their principal office in Altoona, Blair county, Pa., and a branch office in Philadelphia.

That on December 31, 1872, the Cambria Mining and Manufacturing Company, was the owner of a tract of land known as the Sonman Survey, situate in Washington township, Cambria county, Pa., and on that day leased to James H. Dysart and Daniel Laughman, the right to mine, transport, and sell coal for a term of ten years from said date " in and from a certain vein of coal found on said tract of land recently opened on the tram-road leading from Westbrook's siding, connecting with the Pennsylvania Railroad, to the steam saw-mill of P. M. Wolleslagle & Son, it being the only drift or entry then opened on a level with said tram-road, and nearly opposite a point on Ben's creek, known as Ben's Hole."

That on January 1, 1874, William H. Piper, one of the complainants, became associated in business with the said Dysart & Laughman, under the firm name of Dysart & Co. At this time Dysart & Laughman had partly opened a drift on this tract, and hauled the coal over a tram-road to the Pennsylvania Railroad. After Mr. Piper became associated with Dysart & Laughman, and the new partnership of Dysart & Co. was formed, work was pushed more vigorously; chutes were put in, necessary buildings erected, and an extension of the railroad siding was built about a half mile in length, connecting the said mine with the main line of the Pennsylvania Railroad, and in that year, 1874, they commenced to mine and ship coal therefrom to market. A second mine was afterwards opened, or rather a second entry into the original drift was afterwards opened.

That soon after the formation of the partnership of Dysart & Co., as aforesaid, the firm began to seek out a name or trade-mark for their coal, by which it could be known and sold in the market. A number were suggested, among others "Ben's Creek" and "Eureka;" the latter was adopted, but

was discontinued after a brief time, it being discovered that it was an infringement upon the trade-mark of Berwind, White, & Co., also miners and shippers of coal. The name " Sonman " was then adopted by said firm as a trade-name descriptive of the coal mined and shipped by them, and not in any sense designative of the locality from which it came.

That the word Sonman was suggested because of its being the name by which a large tract of land of over five thousand acres on which the mine of the said firm was opened and was known in that neighborhood, the said tract having been originally patented in the name of Arent Sonman : said tract was also locally known as the " Big Survey," and the names Sonman and Big Survey were used as synonymous terms.

That at the time of the adoption of the word Sonman as aforesaid, there was a station of that name established on a part of this property on the line of the Pennsylvania Railroad Company, one mile and a half west of the mine of Dysart & Co. There was also a small collection of houses near the station, one house on the north side of the railroad and three or four houses on the south side of the railroad, and also an unoccupied store building on the south side. The houses were rough frame buildings and principally unoccupied. There had also been a saw-mill there at that time, but it was then unoccupied. The houses had been used for miners. In about the year 1873 a post-office was established at the station aforesaid, called Sonman, but it remained there but a short time, and was removed to Portage, some miles distant, where it had formerly been located and established under the same name. At the time of the adoption of the name Sonman by complainants, the post-office was at Portage.

That no business of any kind other than the railroad business was carried on at Sonman station at the time of the adoption of the name of Sonman by Dysart & Co., and the small collection of houses there were nearly all unoccupied and had been so for a considerable time.

That prior to the lease from the Cambria Mining and Manufacturing Company to Dysart & Laughman, small quantities of coal were mined from the tract by Emanuel James, D. H. Blackburn & Co., and R. B. Westbrook. No distinctive trade name was given to the coal so mined, by which it was known

Statement of Facts.

in the market, but the coal mined by Westbrook was sometimes spoken of as coming from the Sonman tract.

That on July 26, 1879, the said firm of Dysart & Co. was dissolved by mutual consent, and the said James H. Dysart and Daniel Laughman on that day transferred and assigned all their right, title and interest in and to all the personal property of the said firm of Dysart & Co., in and about the Sonman mine, or belonging thereto, and also all their right, title, and interest in the joint siding connecting the Pennsylvania Railroad with the Sonman mines, reserving, however, unto the said Dysart & Laughman, the right " to use said siding when necessary in their business.

That subsequently, on August 15, 1879, the lease was extended in writing for a period of ten years, viz.: Until December 31, 1892, and on the first day of August, John H. Lewars became associated with the said W. H. Piper, under the firm name of W. H. Piper & Co.

During the years 1881 and 1882, the said W. H. Piper & Co., the complainants, became the owners in fee of a neighboring tract of about fifteen hundred acres of land containing coal, and opened thereon a mine at or near Lilly Station, a distance of about two miles from the Sonman Colliery. That the mine on the Sonman tract is called Colliery No. 1, and the mine at Lilly's, Colliery No. 2. That complainants have sold the product of both mines by the trade name Sonman. That the coal mined from both these colleries is from the same vein, being known geologically as the B or Miller Vein, and is of the same general quality and value in the market, the only difference being that the coal mined from Colliery No. 1 is rather lumpier than that mined at Colliery No. 2.

That the coal so mined by the complainants has been extensively advertised in the United States and in foreign countries as Sonman coal and is so generally known in the trade, and a good reputation has been established for said coal.

That the defendants are the owners of fifty acres of the original Sonman tract or survey, and about the year 1879 opened a mine on the east side of Ben's creek opposite to mine No. 1 of complainants, and began to mine coal, and still do mine coal therefrom. The actual workings of defendants' mine are not upon the Sonman tract, but the chutes and some of their buildings are upon the same.

### Master's Report.

. That on or about the year 1884, a short time before this bill was filed, the defendants began to sell their coal under the name of Sonman, and in their letter-heads and bill-heads describe themselves as "miners and shippers of Sonman coal." That in 1884, before the filing of this bill, the defendants sold coal from the mine on Ben's creek to Meeker, Hedstrom & Co., of Chicago, by the name of Sonman, and that the same was so called on printed circulars issued by the said Meeker, Hedstrom & Co.

That upon complaint made by A. C. Brackenbush & Co., agents of plaintiffs for their coal in Chicago, that Meeker, Hedstrom & Co. were selling coal under that name at a lower price, notice was given by plaintiffs to Meeker, Hedstrom & Co. to discontinue the use of the name Sonman, and they accordingly discontinued its use. That the defendants were applied to by the plaintiffs to desist and refrain from selling, or offering to sell, their coal as Sonman coal, and that they declined such request, alleging that they had an equal right with the plaintiffs to use the said name for their coal.

—In discussing the questions raised as to the rights of the parties under the foregoing findings of fact, the master reported:

The use of the name Sonman being admitted by the answer of the defendants, the main question in the case is: Is the word Sonman such a name as the plaintiffs can acquire the sole and exclusive right of using in connection with the sale of their coal? All the other questions are secondary and grow out of the main question.

The defendants contend that it cannot be so exclusively appropriated by complainants:

1. Because it is a geographical name; the name of a large tract of land out of which the coal of complainant is mined.

2. Because it is the name of a station on the Pennsylvania Railroad, located on a part of the Sonman survey.

3. Because it is the name of a post-office which was at one time located at Sonman station, at which there were five or six houses occupied by miners.

4. Because the complainants were not the first to use the name as applied to coal.

5. Because even if Dysart & Co. did have the right to use

the word Sonman as a trade-mark, they did not assign it to W. H. Piper.

6. Because the complainants are guilty of a fraud in calling the coal mined at Lilly Station and not on the Sonman survey, Sonman coal, and therefore not entitled to relief.

That the name of a country or a section of country cannot be appropriated as a trade-mark, as against other persons carrying on trade within the section of country, is well settled. The rule is thus laid down in Bispham's Equity, p. 411, § 457: " The name of a country or a section of country cannot be appropriated as a trade-mark by the owner of a particular product, e. g., coal, of that country, so as to exclude owners of other similar products coming from the same country or section of country from using the name."

\*       \*       \*       \*       \*       \*       \*       \*

—After citing and quoting from the cases of Canal 'Co. v. Clark, 13 Wall. 311; Wotherspoon v. Currie, L. R. 5 E. & I. App. 512; s. c. 18 Weekly R. 564; Lochgelly Iron Co. v. Christie, 6 Ct. of Sessions Cas. 4th Series, 482 ; Day v. Brownrigg, L. R. 10 Ch. Div. 294: DeBoulay v. DeBoulay, L. R., Priv. C. App., 441, and Glendon Iron Co. v. Uhler, 75 Pa. 467, the master proceeded :

From these cases may be deduced the reason why a geographical name cannot be adopted as a trade-name ; and it is because the name has, so to speak, been already dedicated to the public and therefore is not susceptible of exclusive appropriation by any one carrying on trade within the limits of the borough, town, region, or country described by the name, and because others may, with equal truth, use the same name. But these cases also show, that it must be a section of country, a town or borough which is essentially of a public character and well known to the public at large, not merely known to a few persons in the neighborhood; and that it is not every small section of country, every trifling collection of houses which may locally be known by a certain name, or even a large tract of land which is merely a private estate, which will bring the party using the name within the rule forbidding the use of a geographical name. Such names are not geographical in the sense referred to. " The Lackawanna Valley," " The Lehigh Valley," " The Cumberland Valley," are instances of geo-

graphical names which are within the rule. They are names descriptive of well known regions of Pennsylvania, known to the public at large.

Tested then by these rules, is Sonman a geographical name? If so, the defendants cannot be enjoined.

\* \* \* \* \* \* \* \*

But little importance can be attached to the fact that at the time of the adoption of the trade-name by the complainants, a railroad station on the line of the Pennsylvania Railroad, a mile west of complainants' mine, was called Sonman, and that there was a telegraph office there. Of themselves, standing alone and unconnected with any borough or town of importance, they are of little consequence. The names of railroad stations are merely private names given and changed at the will of the corporation, and in no sense geographical or descriptive of any large section of country or any borough or settlement known generally to the public. A settlement on the main line of a great railroad, in which there is no store, blacksmith shop, or business of any kind carried on, and which is not reached by a single public road, cannot be said to be a place of any importance whatever, and cannot be known at all to the public generally. It does not rise even to the dignity of a village. In Wotherspoon v. Currie, before referred to, the court says: " Glenfield, which is really only a place of about sixty inhabitants, is not a parish, it is not a hamlet, it is not a district of any special character, but it is an estate of that name upon which some people seem to have erected some houses or manufactories, and on which now some sixty people are living. There was, therefore, nothing whatever to give particular celebrity to the name of Glenfield, so connected with a starch factory, beyond the facts that the appellants had manufactured an article known by that name and having a large sale by that name. That, of course, was a fact of considerable importance to any one who should be minded to appropriate the name of Glenfield to his starch." Glenfield, therefore, was a place many times larger, and at which there does seem to have been some considerable business carried on, and yet it was not a place of such particular importance as to bring it within the rule forbidding the use of geographical names. And this distinction is recognized by Judge MERCUR in Glendon Iron Co. v. Uhler, 75 Pa. 467, before referred to.

Nor does the Sonman tract itself present the features of an independent region. It is not a well-defined region like the Lackawanna Valley, referred to in Canal Co. v. Clark, 13 Wall. 322, with well-defined natural boundaries separating it from adjoining regions. These essentials are wanting. It is irregular and ill defined, the lines crossing the Conemaugh five or six times. Ben's creek flows through and Trout run crosses it. Nor can it be said to form an independent coal basin. In the geological divisions of the state, complainants' mine is in what is termed the Allegheny Mountain District, and in the Wilmore Sub-basin or the First Bituminous Sub-basin.

Nor does the coal at Sonman or Ben's creek present the features of a sub-basin. This clearly appears from the testimony of Mr. Martin, who says, "there are no inclinations of the measures towards Ben's creek; they are perfectly flat." And Mr. Brittain testified, "I don't consider that the plaintiffs' mine exhibited any of the features of a coal basin." And Mr. Sanders, an experienced mining engineer, testified that it would be practicable to open a drift from Trout run to Ben's creek, which would drain itself; and Mr. Westbrook a witness for defendants, substantially says the same thing. Speaking of the Miller vein, being the vein worked by complainants, he says : "If projected from the Sonman or south side to the north side, in which the defendants' mine is situated, they would meet one another."

\*       \*       \* .      \*       \*       \*       \*       \*

—The master then passed to a consideration of the other grounds upon which the defendants objected to the claim of the plaintiffs for equitable relief, as set forth in his report, supra, and after discussing them reported that, although the name Sonman coal had been in use prior to its adoption as a trade-name by Dysart & Co., such prior use had been simply as a term discriptive of the locality from which coal mined on this 5000 acre tract came, and the defendants' evidence was wholly insufficient to sustain their contention of a prior use of the word as a trade-name; but even if it could be found from the evidence that, at some time prior to the date when Dysart & Co. adopted it, it had been so used by persons operating mines on this tract, the plaintiffs had a right to treat it as abandoned and appropriate it as their own; citing Hegeman v.

Hegeman, 8 Daly 7 ; Brown on Trade-marks, §§ 674-691 ; Black-well v. Dibbill, 3 Hughes C. C. 151 ; that the transfer made by Dysart and Laughman, upon the dissolution of the firm of Dysart & Co., by which they assigned to Piper all their interest in the personal property of said firm, in and about the Sonman mines or belonging thereto, and also all right, title, etc., in the joint siding connecting the Pennsylvania railroad with said mines, reserving to said Dysart and Laughman the right to use said siding in their business, vested in Piper the entire right to the use of the word Sonman as a trade-name applied to coal ; that this conclusion was strengthened by the delay of the defendants, for five years after they commenced carrying on the business of mining in the neighborhood, to assert any right to call their product Sonman coal ; that the fact that a part of the coal sold by the plaintiffs under the designation Sonman coal, came from a colliery at Lilly Station not upon the Sonman survey, was immaterial, because the object of the trade-name was merely to distinguish the coal mined by the plaintiffs, and not the locality from which it came, and the tes-timony showed that the coal from the Lilly colliery was of the same general quality as that coming from the Sonman tract, both being taken from the same seam or vein, and no fraud was imputable to the plaintiffs.

In conclusion, the master reported his opinion that the use of the word Sonman by the defendants was intended to cause the public to believe that the coal sold by them had been mined by the plaintiffs, to the injury of the latter, and that therefore the plaintiffs were entitled to the relief prayed for in their bill.

To this report of the master the defendants filed the follow-ing exceptions, alleging error because the master found:

1. That the prior use of the word Sonman, as a geographical name, was not such as to preclude its appropriation in the year 1873 as a trade-name.

2. That the name Sonman was adopted by the firm of Dysart & Co. soon after that firm was formed, as a trade-name, de-scriptive of the coal mined and shipped by them, and not, in any sense, designative of the locality from which it came.

3. That the plaintiffs could acquire as against the defendants the right to use the word Sonman as a trade-name.

4. That the plaintiffs did acquire, as against the defendants, the right to use the word Sonman as a trade-name.

The said exceptions having been overruled by the master, they were filed with his report and renewed in court. Upon argument before the court in banc, a decree was entered, without opinion filed, dismissing the defendants' exceptions,[1] granting a perpetual injunction against the advertising, selling or offering to sell by the defendants of the coal mined by them, or any other coal, under the name of Sonman Coal,[2] and directing that defendants pay the costs of suit.[3] Thereupon the defendants took this appeal, specifying that the court erred:

1-3. In the several portions of said decree.[1 to 3]

4. In not dismissing the plaintiffs' bill with costs.

*Mr. Joseph J. Knox* and *Mr. Wayne MacVeagh*, for appellants:

1. The complainants were not the first to adopt the name Sonman as a name for coal. The evidence shows that this word, as a name for coal on and through the Sonman tract, was used for many years prior to 1873. But the master answers this point by finding that the plaintiffs were the first to use it as a trade-name. This finding shows that the master never fully understood the defendants' position: the defendants have always contended that the name could not be appropriated as a trade-name by any one. The testimony showing that the term Sonman Coal was in use prior to its selection as a trade-name for plaintiffs' coal does not admit of explanation and has not been contradicted. If it is true, the master's decision was error.

2. The name Sonman cannot be legally appropriated as a trade-name, because it is descriptive of locality, and hence a geographical word. The authorities seem clearly to establish these propositions: (*a*) Wherever a geographical name is used as a mere fancy name, not indicating in any way that the thing described is the product of the district described by the geographical name, then the name may become a trade-name. (*b*) But when the geographical name indicates that the thing which it describes is the product of the district designated by the name, then and in such case the geographical name cannot be used as a trade-name by the owner of a part of the district,

Arguments.

to the exclusion of others who are owners of products of a like character from the same district: Fleischmann v. Schuchman, 62 How. 92; McAndrews v. Bassett, 10 Jur. (N. S.) 550; Hirst v. Denham, L. R. 14 Eq. 542; Canal Co. v. Clark, 13 Wall. 311; Newman v. Alvord, 49 Barb. 588; s. c. 35 How. Pr. 108; Brown on Trade-marks, §§ 182, 190; Glendon Iron Co. v. Uhler, 75 Pa. 467; Anhauser-Busch Co. v. Piza, 24 Fed. R. 149; Phalon v. Wright, 5 Phila. 464; Luyties v. Hollander, 30 Fed. R. 632.

3. The master's position was that the word Sonman was not of sufficient importance to be considered a geographical word for the purposes of this case. There is one case cited by him which appears at first glance to sustain him, that of Wotherspoon v. Currie, L. R. 5 Eng. & I. App. 512, but there are obvious distinctions between that case and this. Here the subject is a natural product, found only in a particular locality, to which the name of that locality alone is peculiarly applicable, not a manufactured article with the name used as a fancy name. There any name would have done for defendant's starch, but he moved to the private estate of Glenfield for the very purpose of calling his starch by that name, while here the miners on the Sonman tract cannot describe the place whence their coal comes without using the word Sonman.

4. Nor can the importance of Sonman, which is a question of thousands of acres producing Sonman coal, be measured by the same rule as that of Glenfield. Whether Sonman has natural boundaries, like the Lackawanna Valley, or not, the importance of the word as a geographical name is illustrated by a circular of the plaintiffs in which they speak of "Sonman Station," "Sonman Coal Basin," etc. Various portions of the testimony show that the word is the name of a coal district. No fraud has been shown upon the complainants' rights sufficient to entitle them to a decree, and this must be shown before an injunction can be granted: Canal Co. v. Clark, 13 Wall. 322. It is not disputed that the defendants sold their Sonman coal as their own, and not as the coal of the plaintiffs. They made no attempt to impose on the public. The only ground of the master's finding of fraud is their use of the word Sonman. But their claim of a right to use this word cannot be made the basis for constructing a fraud.

Arguments.

*Mr. Rudolph M. Schick*, for appellees:

1. Is the name a geographical word such that it cannot be legally appropriated as a trade-name? The absence of any difference in the geological formation between the Sonman tract and the surrounding country, was fully proved. The authorities cited by the master to show that Sonman was not a geographical word, amply support him. That a few houses scattered near a railroad station cannot make the name geographical, is sustained by Wotherspoon v. Currie, L. R. 5 Eng. & I. App., 512, a case which was approved by this court in Glendon Iron Co. v. Uhler, 75 Pa. 467, and is strikingly like the case at bar. The remark of V. C. MALIN in that case, in the court below, 18 Weekly R. 564, that Glenfield was known to persons in its neighborhood, but to the kingdom at large utterly unknown, is equally true of Sonman.

2. Considering the subject with respect to the whole tract, the case is the same. It presents none of the features of a geographical division, but is a private estate and nothing more. Every owner of a farm might as well claim his farm to be a geographical division. The term " district of country," as used in Canal Co. v. Clark, 13 Wall. 327, was applied to a great valley known throughout the country. In the Glendon case this court applied the true test when it distinguished between a public name and the name of a private estate, which is a matter of caprice and changeable at the will of the owner. So, names of railroad stations are private matters and it is common to change them. The fact that there is a station on this tract cannot make the name geographical. The word is not descriptive of the coal as coming from this tract, and the testimony shows that the existence of the Sonman estate is utterly unknown outside the immediate neighborhood.

3. The argument of appellants that every miner on this tract has a right to the use of the word Sonman, involves the proposition that the owner of a private estate has a property in the fancy name he has given it, which all the cases deny: Day v. Brownrigg, L. R. 10 Ch. Div. 294; Street v. Union Bank, L. R. 30 Ch. Div. 156; Pollock on Torts, 138; DeBoulay v. DeBoulay, L. R. 2 Priv. C. App. 441; Glendon Iron Co. v. Uhler, 75 Pa. 470; Wotherspoon v. Currie, L. R. 5 E. & I. App. 512; Lochgelly Iron Co. v. Christie, 6 Ct. Sess. Cas., 4th Series, 482.

It further demands that property in such a name shall run with the land and be divisible to the same extent that the land is, the logical results of which are absurd. And it is impossible to keep up the distinction between the coal which comes from that part of their mine which may be on the Sonman tract and the part thereof which is not. Such confusion can never take place where the law is properly applied, e. g., between Lacka- wanna and Schuylkill coal. But the master has found that appellants do not mine coal from the Sonman tract.

4. The master's finding that there was an intention on de- fendants' part to deceive the public, is in accordance with all the facts of the case. The name Sonman had no value as a name for coal till plaintiffs gave it such by acquiring a reputa- tion for their coal under that name. That defendants adopted it for this reason and not because it was a necessary designation descriptive of locality, is shown by the fact that their adoption of it was five years after the opening of their mine and that they advertised their coal under this name without anything to distinguish it from that of plaintiffs. Equity will enjoin the use of even a geographical name used for the purpose of perpetrating a fraud: Brooklyn White Lead Co. v. Masury, 25 Barb. 416; Boulois v. Peake, L. R. 13 Ch. Div. 513, note; Hudson v. Osborne, 39 L. J. Ch. 79; Fulwood v. Fulwood, Weekly Notes (English) for 1873.

OPINION, MR. JUSTICE CLARK:

The plaintiffs, W. H. Piper & Co., are miners and shippers of bituminous coal in Cambria county. They are engaged in mining what is known on the geological maps of the state as the Miller vein, at Ben's creek, on the western slope of the Allegheny mountains; their mines are located upon what was sometimes called the Big Survey, containing an area of about ten square miles, or over six thousand acres. This large body of land, it is said, was conveyed by William Penn directly to one Arent Sonman, and hence has been generally known as the Sonman survey. From the testimony of Mr. Westbrook, it appears that in the Sonman tract there are several seams or veins of coal, one above another. Mr. Westbrook says: "The bottom vein is known as vein A; a short distance above this is a small vein known as A primal; the next higher vein is

known as vein B, and a few feet above this is a smaller vein known as B primal; the next is known as C, and so on to E; E being the highest upper workable vein.   These are the designations given in geological surveys.   These several veins have other several local designations; they are known by miners in the neighborhood by the name of the person who owned them. The Lemon vein was so named because it was opened by John A. Lemon or his father.   The Lemon vein is vein E, and the Miller vein, said to have been first opened by a man of that name, is vein B.   The coal mined from the same vein in different localities is not always of the same quality.   The Miller vein, or vein B, at Gallitzin, ten miles east of Sonman, is very much softer ; while at South Fork, which is eight or ten miles from Sonman west, it is very much harder.   In some cases, two or three miles make a difference in the quality of the coal from the same vein."

In December, 1872, the Cambria Mining and Manufacturing Company, the owner of the Sonman survey, by an instrument of writing in the form of a lease, granted to Dysart and Laughman, for a term of ten years, the right to mine, transport, and sell coal out of the Miller vein from a certain drift opened " nearly opposite a point on Ben's creek known as Ben's Hole." On January 1, 1874, Piper became a partner, the business was conducted under the name of Dysart & Co., and the firm commenced to mine and ship coal in considerable quantities therefrom to market.   On July 26, 1879, the firm of Dysart & Co. dissolved, Dysart and Laughman transferring their interest to Piper.   The lease was afterwards extended, and Lewars became associated with Piper as a partner under the name of W. H. Piper & Co., the complainants in the bill.   Upon the dissolution of the firm of Dysart & Co., Dysart and Laughman began operations upon another portion of the Sonman tract, and were, and are now, engaged somewhat extensively in the mining and shipping of coal therefrom.

The complainants in the bill allege that soon after the formation of the firm of Dysart & Co., which was on January 1, 1874, the firm sought to select and establish a trade-name for their coal; that " Ben's Creek " and " Eureka " were at first suggested, and, upon due consideration, the latter name was adopted; but when it was afterwards discovered that this was

an infringement upon the trade-name of Berwind, White & Co., also miners and shippers of coal from the Clearfield region, the name "Sonman" was adopted as a trade-name, and that name has ever since been used and applied as the trade-name of all the coal shipped from their mines; that their coal is known and recognized in the trade as "Sonman Coal," and is thus distinguished from other kinds and qualities of bituminous coal in the market. The plaintiffs complain that the defendants are infringing their right, by wrongfully and fraudulently shipping an inferior coal under the same trade-name, and offering it for sale as Sonman coal, thus inducing dealers and consumers to suppose that the coal which they buy from the defendants is the Sonman coal of the plaintiffs.; whereby the public is deceived and the reputation of the plaintiffs' coal is injured, etc.

It is clear from the evidence, and the fact is found by the master, that the coal taken from these mines has heretofore been spoken of and sold as "Sonman Coal." Prior to 1874, however, the term "Sonman" would seem to have been applied, not as a trade-name, but merely as descriptive of the location of the mines. Mr. Alexander M. White, who mined the Lemon vein in 1852 or 1853, says: "We called it the Sonman coal in contradistinction to the Lilly Mill coal, which was mined east of it, between planes 3 and 4; this was a common appellation for it; we called the coal from that survey Sonman coal." Hon. John Dean testifies, that there were about five thousand acres known to him as the Sonman lands; that the coal is called the Sonman coal, and that he always heard it called by that name; and that it was a very common name as far back as 1854. Mr. Westbrook, who opened the Miller vein and sold coal to the Altoona Manufacturing Company, to the Logan Iron and Steel Works, to the Phœnix Iron Company, and to dealers, says: "I always called all coal mined and shipped Sonman coal, as designating the locality or region in which it was mined; sometimes, however, designating the coal by the name of the vein by which it is known."

But the plaintiffs have introduced evidence to show that a short time after January 1, 1874, they formally adopted the term "Sonman" as a trade-mark or name for their coal, and they now seek an injunction to restrain the use of that term by

the defendants to any of their coal, even though the same be mined from the Sonman lands.

The ownership of a trade-mark has, in general, been considered as a right of property, and equity will protect that right from infringement: proof of fraud is not required; the mere violation of the right is sufficient to induce the exercise of the equity powers of the courts. The trade-name of any natural product or other article of manufacture, upon which a trade-mark cannot conveniently be affixed, though not strictly a trade-mark, is, nevertheless, a species of property and will, as a general rule, be protected in like manner. Trade-marks are the proper subject of assignment, to the extent, at least, that unless reserved they pass with an assignment of business: Sebastian on Trade-marks, 236 ; and the assignment by one partner of all his interest in a firm to his copartners will carry with it the exclusive use of the trade-mark of the firm : Menendez v. Holt, 128 U. S. 514. " As distinct property, separate from the article created by the original producer or manufacturer, it may not be the subject of sale ; but when the trade-mark is affixed to articles manufactured at a particular establishment and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred, either by contract or operation of law, to others, the right to the use of the trade-mark may be lawfully transferred with it. Its subsequent use by the person to whom the establishment is transferred, is considered as only indicating that the goods to which it is affixed are manufactured at the same place, and are of the same character as those to which the mark was attached by the original designer." Such is the appropriate language of Lord CRANSWORTH, in the case of Leathercloth Company v. The American Leathercloth Company, in 11 Jur., N. S. 513 ; Kidd v. Johnson, 100 U. S. 617. We assume, therefore, that W. H. Piper, as the assignee of Dysart and Laughman, possessed the rights of the firm of Dysart & Co. in any trade-mark which that firm, at the time of its dissolution, may have acquired, and, with his approval, the new firm of W. H. Piper & Co. were certainly entitled to exercise that right.

But we are not clear that either Dysart & Co., or W. H. Piper & Co., or any other parties operating the Sonman mines, had a right to appropriate the term " Sonman " to the exclu-

sion of others similarly engaged. The object of a trade-mark is that the article, to which it is attached or belongs, may be distinguished from articles of a similar kind, and thus be known and identified in the market; its purpose is to indicate the personal origin of the article to which it is applied, or the source from which it comes. The office of a trade-mark is thus defined by Mr. Justice FIELD, in Manufacturing Co. v. Trainor, 101 U. S. 53: "Every one is at liberty to affix to the product of his own manufacture any symbol or device not previously appropriated, which will distinguish it from articles of the same general nature, manufactured or sold by others, and thus secure to himself the benefits of increased sale by reason of any peculiar excellencies he may have given to it. The symbol or device thus becomes a sign to the public of the origin of the goods to which it is attached, and the assurance that they are the genuine article of the original producer."

But in the exercise of the right to establish a trade-mark, there are certain limitations which must be observed. No property can be acquired in any word, mark, or device, which denotes merely the nature, kind, or quality of an article. Thus, in Raggett v. Findlater, L. R. 17 Eq. 29, an injunction to restrain the use of the words "Nourishing Stout," which the plaintiff had previously used, was refused upon the ground that "nourishing" was a mere English word denoting quality. "The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols that are appropriate as designating the true origin or ownership of the article or fabric to which they are attached; but he has no right to the exclusive use of any words, letters, figures, or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right to appropriate a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose:" Amoskeag Manufacturing Company v. Spear, 2 Sandf. S. C. 599. And whilst the office of a trade-mark is to indicate the personal origin or ownership of an article, yet a merely geographical name cannot be so used: Bispham's Eq., § 457; Canal Company v. Clark, 13 Wall. 311. In the case last cited, it was held

that the word " Lackawanna," which is the name of a region of country in Pennsylvania, could not, by combination with the word coal, constitute a trade-mark, because every one who mined coal in the valley of the Lackawanna had a right to represent his coal as Lackawanna coal. " The word ' Lackawanna,' " says Mr. Justice STRONG, " was not devised by the complainants. They found it a settled and known appellative of the district in which their coal deposits and those of others were situated. At the time they began to use it, it was a recognized description of a region and, of course, all the earths and minerals in the region." . . . . . " It must then be considered as sound doctrine," says the learned Justice, " that no one can apply the name of a district of country to a well-known article of commerce, and obtain thereby such an exclusive right to the appellation as to prevent others inhabiting the district, or dealing in similar articles coming from the district, from truthfully using the same designation. It is only when the adoption or imitation of what is claimed to be a trade-mark amounts to a false representation, expressed or implied, designed or incidental, that there is any title to relief against it."

In the case of Newman v. Alvord, 49 Barb. 588, the plaintiffs manufactured a cement at Akron, N. Y., and sold it under the name of " Akron Cement." The defendants made the same sort of cement at Syracuse, and labeled it " Onondaga Akron Cement." The court held that, " though all the world had a right to manufacture cement at Akron and call it Akron cement, yet the action of the defendants, in calling their cement made at Syracuse, Akron cement, was a fraud on the plaintiffs and on the public, and should accordingly be restrained." To the same effect is our own case of Glendon Iron Co. v. Uhler, 75 Pa. 467, where a corporation adopted the trade-mark " Glendon " upon their iron. The place where their furnaces were located was afterwards erected into a borough by the name of Glendon. Another company, engaged in business in the same place, afterwards used the word " Glendon " on their iron, and it was held that the second company was justified in so doing. " The appellees," said this court in the case cited, " put upon their pigs the initials of their firm and the name of their town. That name was Glendon to the whole world. It cannot be that the previous appropriation by

the appellants of the word which now is the name of the town, prevents any other manufacturer of pig iron within its limits from using the same word. If it be so now, it may continue through all coming time. The boundaries of the town may be enlarged; the borough may grow into a city; the manufacturers of pig iron may be multiplied, and the word most expres sive to indicate their location must be denied to all save one. So far as the authorities go to restrain a manufacturer from the adoption of a truthful trade-mark, we will endeavor to enforce them; when asked to go further we must decline. If the effect of the incorporation of the appellants' district of country into a town by the name of Glendon, has been to deprive them of some of their former rights, they must submit to the consequences." It is upon the same principle that every person may put his own name upon his own goods, notwithstanding another person of the same name may, in that name, manufacture and sell the same or a similar article: Burgees v. Burgees, 17 Eng. L. & E. 257.

Applying these principles to the case now under consideration, it seems clear that the plaintiffs are not entitled to the exclusive use of the word "Sonman" as a trade-mark. It is clear, from the evidence, that Sonman is a word of geographical signification; it denotes a specific territory or region of country of considerable extent, which is and for many years both before and since the trade-name was adopted has been devoted to the production of a somewhat peculiar quality of coal by different operators. In the year of 1854 the village of Sonman was built upon this tract. Mr. Alexander M. White testifies, "That the village consisted of a steam saw-mill, a store, a dwelling which he constructed for himself, one for his superintendent, and six tenement houses. The village was on the main line of the Pennsylvania Railroad, and although at first there was no station, a siding was constructed to facilitate the shipping of coal and lumber." Mr. Richard P. Westbrook testifies, "that in 1867 there was a settlement or village, consisting of two large mansion houses, one 40 by 60, the other 30 by 40, a steam saw-mill, a store-house in which was kept a company store, two barns, one of which was very large, a blacksmith shop, several tenements for workmen, and an iron siding connecting the lumber yard with the Pennsylvania Railroad. There were sev-

eral other houses or tenements in different parts of the Sonman property. This village was known by the name of Sonman. There was a post-office there at that time, kept in the store-house. James A. Shoemaker was the postmaster." He further testifies, "that a station was established at Sonman by the Pennsylvania Railroad Co. in 1871; the building was destroyed by fire. In the latter part of 1872 or the early part of 1873, the Pennsylvania Railroad Co. erected a permanent building there for ticket and freight purposes and appointed an agent. About the same time, a telegraph station was established there by the Western Union Company; both the railroad station and the telegraph station were called Sonman. There was a post-office called Sonman located there previous to 1857. A. F. Cantwell was postmaster in 1857. The office was continued by that name for more than ten years; and when Shoemaker removed from Sonman, a man residing at Portage, one mile west, was appointed, and he removed the office from Sonman to Portage." Mr. Martin says that in 1869 the saw-mill was gone; the post-office had been removed to Portage, and some houses were vacant, but the mines were still in operation, and continued to be in operation until the railroad and telegraph stations were established in 1872 or 1873 and ever since that time.

It may be that the Sonman tract does not present the features of what the appellees call an independent region; that it is not so extensive or so sharply defined in its natural boundaries as the Lackawanna Valley; it may be, also, that Sonman cannot be considered as a separate coal basin, or even as a sub-basin, yet it is plain that it had received a distinct geographical recognition from the public. These lands, for many years prior to the time that the plaintiffs adopted their trade-name, were, as we have seen, known as the Sonman survey. Its boundaries were marked and defined upon the map of Cambria county; the village erected thereon was Sonman; the post-office was Sonman; the railroad station was Sonman; the telegraph office was Sonman; the coal taken from the mines was shipped as Sonman coal, and, by this desciption, was known in the market. Can it be doubted that the term Sonman, in the year 1874, was a name descriptive of a locality? If it was, the name, when applied to its own natural products, must be taken in its geographical sense. We do not say that a geographical name may

not, in some cases or under some circumstances, be applied as a trade-name; but we do say, that when the article to which it is applied is a product of the place named, the term cannot be used as a trade-name by one to the exclusion of others, owners of like products of the same place. This is the doctrine of all the cases. The case of Wotherspoon v. Currie, L. R. 5 E. & I. App. 512, relied upon by the appellees, when properly considered and understood, will be found, we think, to be consistent with this statement of the law. In that case, as we understand it, the trade-name " Glenfield " was applied to a starch which, at the time of the infringement, was not made at Glenfield, but elsewhere. The name was then used, and for some time before that had been used, in an entirely fictitious sense; as denoting the personal origin of the article known as " Glenfield Starch," and not in connection with the place of its manufacture. The word Glenfield, assuming that it may have a geographical import at first, was at the time of the infringement, used in an entirely different sense, and for a wholly different purpose; and the remarks of the Lord Chancellor are intended to emphasize the fact that the defendant, who was then the owner of Glenfield, had nothing to lose in being denied the privilege of affixing the name of his private estate to his products, as the place was of little consequence, and he could hope for no advantage therefrom, only from the fact, of considerable importance, that the plaintiff had manufactured a superior article of starch known by that name, which had a great reputation in the market, and of which he had made large sales.

It is doubtless true, as a general proposition, that the name of a private estate may be used by the owner as a trade-name. The case just cited is an illustration in point; for the plaintiff, in that case, at first manufactured starch on the private estate of Glenfield, and called his starch Glenfield. He removed from his private estate, but retained for his starch manufactured elsewhere the same trade-mark, and his right to do so was sustained by the judgment. But Sonman is not the name of a private estate in this sense; it is the name of a large boundary of land containing a number of separate private estates, owned by a number of different persons, all of whom are engaged in the same business of mining and shipping coal; and we hold that no one of these can assume and adopt, as a trade-name, the

name by which the place is generally known in the geography of the country, to the exclusion of others.

> The decree is reversed, and the bill is dismissed at the cost of the appellees.

On November 4, 1889, a motion for a re-argument was refused.