Quaker State Oil Refining Company,
Appellant, *v.* Steinberg et al.

274

Argued December 1, 1936.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*J. Villard Frampton,* of *Frampton & Courtney,* with him *Frederick H. Spotts,* of *Pepper, Bodine, Stokes & Schoch,* for appellant.

*Robert T. McCracken,* with him *Yale L. Schekter* and *C. Russell Phillips,* for appellees.

OPINION BY MR. JUSTICE SCHAFFER, January 18, 1937:
This is an appeal from the decree of the court below dismissing the complainant's bill in equity by which it

sought to enjoin defendants from using the term "Quaker City" or any trade name in which the word "Quaker" is used, in connection with the sale of their motor oil.

In 1914 the complainant commenced marketing a motor oil under the name "Quaker State." It is prepared from crude oil produced in certain sections of New York, Pennsylvania, Ohio and West Virginia, known in the trade and to the public as Pennsylvania Grade Crude Oil. From 1914 "Quaker State" oil has been sold by automobile service stations and garages throughout the country. It has been extensively advertised in magazines and newspapers, also by means of outdoor signs along the highways. This oil was for some years specifically recommended by the manufacturers of Franklin motor cars for use by their owners. The business has experienced a steady growth, and at the time this case was tried, in 1935, upwards of 70,000 dealers handled the oil and the annual aggregate of sales amounted to 10,000,000 gallons, in 1930 or 1931 to a still larger gallonage.

The defendants started to market "Quaker City" motor oils in 1919 in a small way, selling directly to consumers, for the most part to operators of fleets of motor trucks. In 1920 they began the sale of their product through service stations and garages and continued to do so until the time of trial. Defendants' oil is likewise made from Pennsylvania Crude, and although sold at a slightly lower price, according to the evidence is in no sense inferior to that of complainant. The advertisements of and the containers for the two oils are not the same. The containers for "Quaker State" are primarily green in color, those for "Quaker City" are a bright orange.

The chancellor entered a decree enjoining defendants from selling their product under the trade name "Quaker City" and from using the word "Quaker" alone or with other words as the name of their motor oil. The court

in banc overruled the chancellor, the chancellor dissenting, and held that "Quaker State" is a descriptive term; that no exclusive right to use a descriptive term can be secured in the absence of a showing that it has a secondary meaning, and it not being shown that the term as applied to complainant's oil had such a meaning in 1919, when defendants entered the field, the relief prayed for should not be granted.

We think Judge PARRY, speaking for the majority of the court below, properly summed up the legal principles governing the case by saying: "We think the word Quaker [State] is a descriptive term not capable of exclusive appropriation by anyone and that it may be used by the world at large in an honestly descriptive and non-deceptive way. The use of truthfully descriptive terms may not in any case be absolutely prohibited; the first trader being entitled as against another only to such protection as will prevent such other from using the term to pass off his goods as those of the original appropriator, 63 C. J. 425."

Aside from any judicial determination, it is obvious that the words "Quaker State" are geographical. A state, like a person, may have more than one nickname. Because of its founder and its early settlers no other state could be so properly dubbed "Quaker" as Pennsylvania, and when so spoken of everyone of average intelligence understands that Pennsylvania is meant. Had complainant adopted as the designation of its product the words "Pennsylvania State," no one would contend that it had not appropriated a geographical term, none the less has it done so, because it has taken one of the state's nicknames.

There are two cases in which the courts were called upon to determine the nature of the name "Quaker City." In both the name was held to be geographical: *Loughran v. Quaker City Chocolate & Confectionery Co.*, 296 Fed. 822, and *Quaker City Flour Mills Co. v. Quaker Oats Co.*, 43 App. (D. C.) 260. So it has been

determined that "Keystone" when used as an adjective for state is a geographical term and not exclusively appropriatable: *Cohen v. Nagle,* 190 Mass. 4, 76 N. E. 276; *Buzby v. Davis,* 150 Fed. 275. See as to other not exclusively appropriatable nicknames of states: Nims, Unfair Competition and Trade-Marks (2nd ed.), p. 319.

Mr. Justice DREW, when on the Common Pleas, had occasion to consider the attempt to exclusively appropriate the word "Columbia" as a trade-mark or trade name in *Columbia Film Service, Inc. v. Columbia Pictures Corp.,* 76 Pittsburgh Legal Journal 529, and decided that the plaintiff had not acquired nor could it acquire the exclusive right to the use of the word "Columbia" as a trade name, for the reason that "Columbia" means the United States and is a geographical designation incapable of exclusive use.

It is clear under the best considered authorities that a purely descriptive term such as a geographical one cannot be exclusively appropriated by anyone. This principle is established for the obvious reason that to permit the exclusive appropriation of such a term would prevent others from properly describing their product and hence a monopoly would result: Derenberg, Trade-Mark Protection and Unfair Trading, p. 238. "It is conceded, as a general rule, that the name of a town or city cannot be so appropriated as the exclusive property of anyone": *Glendon Iron Co. v. Uhler,* 75 Pa. 467, 470. "And whilst the office of a trade-mark is to indicate the personal origin or ownership of an article, yet a merely geographical name cannot be so used": *Laughman's Appeal,* 128 Pa. 1, 19, 18 A. 415; *Hoyt v. Hoyt,* 143 Pa. 623, 22 A. 755. Three early cases in the United States Supreme Court are frequently cited: *Canal Co. v. Clark,* 80 U. S. 311, involving the use of the word "Lackawanna" in connection with coal; *Brown Chemical Co. v. Meyer,* 139 U. S. 540, involving the use of the term "Iron Bitters," and *Columbia Mill Co. v. Alcorn,* 150 U. S. 460, involving the use of "Colum-

bia" in connection with flour. There are many other cases laying down this principle.*

If, however, the geographical term has taken on a secondary meaning it will be protected. This exception is best stated in the case of *Merriam Co. v. Saalfield,* 198 Fed. 369, 373: "Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public and so may be used by anyone of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing

---

* A few of the most recent ones are: *American Watch Import Co. v. Western Clock Co.,* 16 F. (2) 347 [American]; *Cleveland Opera Co. v. Cleveland Civic Opera Asso.,* 154 N. E. 352, 22 Ohio App. 400 [Cleveland]; *Winter Garden Dist. Chamber of Commerce v. Winter Garden Fair,* 299 S. W. 512 (Tex. Civ. App.) [Winter Garden]; *Standard Oilshares v. Standard Oil Group,* 17 Del. Ch. Div. 113, 150 A. 174 [Standard Oilshares]; *Yellow Cab Co. v. Creasman,* 185 N. C. 551, 117 S. E. 787 [Yellow Cab]; *American Automobile Asso. v. American Automobile Owner's Asso.,* 216 Cal. 125, 13 P. (2) 707 [American]; *Finchley, Inc., v. Finchly Co.,* 40 F. (2) 736 [Finchley]; *Van Camp Sea Food Co. v. Cohn-Hopkins,* 56 F. (2) 797 [Chicken of the Sea]; *Silver Springs Paradise Co. v. Ray,* 50 F. (2) 356, Certiorari Denied, 52 Sup. Ct. 29 [Silver Springs]; *National Grocery Co. v. National Stores Corp.,* 127 A. 925, 97 N. J. Eq. 360 [National]; *Fred Butterfield & Co. v. Abraham & Straus,* 208 N. Y. S. 740, 212 App. Div. 384, Affd. 241 N. Y. 560 [Normandy]; *McIlhenny Co. v. Trappey,* 277 F. 615 [Tabasco].

abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article, that in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning. Here, then, is presented a conflict of right. The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud." "Secondary meaning is association, nothing more. It exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds": Nims, supra, p. 105, "When the word is incapable of becoming a valid trade-mark, because descriptive or geographical, yet has by use come to stand for a particular maker or vendor, its use by another in this secondary sense will be restrained as unfair and fraudulent competition, and its use in its primary or

common sense confined in such a way as will prevent a probable deceit by enabling one maker or vendor to sell his article as the product of another": *Computing Scale Co. v. Standard Computing Scale Co.*, 118 Fed. 965, 967. See also *American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 53 N. E. 141; *American Brewing Co. v. St. Louis Brewing Co.*, 47 Mo. App. 14; *Cady v. Schultz*, 19 R. I. 193, 32 A. 915; *Newman v. Alvord*, 49 Barb. 588; *Finchley, Inc. v. Finchly Co.*, 40 F. (2) 736; *Bayuk Cigars, Inc. v. Schwartz*, 1 F. Supp. 283; *Delaware, L. & W. R. Co. v. Lackawanna Motor Freight Lines, Inc.*, 117 N. J. Eq. 385, 175 A. 905; *Elgin National Watch Co. v. Illinois Watch Case Co.*, 179 U. S. 665; Derenberg, supra, p. 338; Hopkins on Trade-Marks, secs. 65, 66, 67.

The evidence produced by plaintiff as to the words "Quaker State" acquiring a secondary meaning, relates to the years following 1919, when the defendant started in business. The evidence shows that at least some part of the purchasing public in using the words "Quaker State" and "Quaker" in connection with oil had reference to the complainant's product. But even if we assume that the words "Quaker State" acquired a secondary meaning after 1919, it would not aid the complainant. Both on reason and authority the complainant's trade name must have acquired a secondary meaning before the defendants began the manufacture and sale of their product: *Upjohn Co. v. Wm. S. Merrell Chemical Co.*, 269 Fed. 209. The acquisition of a secondary meaning following this time could not justly divest the defendants of their rights.

The only evidence from which it could be inferred that the name of complainant's product had acquired a secondary meaning prior to 1919 is that its product has been marketed and had been nationally advertised for five years under this name. There is no other evidence from which it could be inferred that the public associated "Quaker State" or "Quaker" with the com-

plainant's product at that time. "The mere adoption and use of words in advertisements, circulars and price lists and on signs and stationery give no exclusive right to their use": *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*, 297 Ill. 359, 364, 130 N. E. 765. See also *Continental Corp v. National Union Radio Corp.*, 67 F. (2) 938, 942. "It is an accepted principle of the common law that mere advertising is insufficient to establish trade-mark use": Derenberg, supra, p. 505.

But even if it be assumed that the words "Quaker State" acquired a secondary meaning in 1919, it will not help the complainant's case. The defendant can only be enjoined from the use of the name "Quaker City" if it is deceptively similar thereto: *Celluloid Mfg. Co. v. Cellonite Mfg. Co.*, 32 Fed. 94. There is nothing in the names "Quaker State" and "Quaker City" that should confuse the purchasing public. Even the most careless observer would recognize the distinction between the two. "Quaker State" denotes to all, "Pennsylvania," and "Quaker City" denotes "Philadelphia." A similar situation arose over the right to use the words "Quaker City" and "Quaker Maid" as applied to candy. In that case it was said: "The defendant introduced no evidence that these trade-marks are confusing because of similarity. In other words, it did not attempt to prove that the trade has ever been confused by the marks or that purchasers have ever mistaken one for the other, or have mistaken the wares they mark, a situation which at first induces one's mind to conclude that the ground for opposition is not tenable. Therefore, we must determine from the trade-marks themselves whether they resemble each other so closely that confusion or mistake in the mind of the public will likely occur. . . . Without reciting the processes by which we have arrived at our conclusion, it will be enough to say that after a careful study of these trade-marks we have not found such similarity, and, therefore, are constrained to affirm the finding of the learned

District Judge": *Loughran v. Quaker City Chocolate & Confectionery Co.*, 296 Fed. 822, 826.

It is true that the evidence before us shows there is confusion on the part of some of the consumers. This confusion, however, is the result of the fact that some of the purchasers call the plaintiff's oil by the name "Quaker" rather than "Quaker State." The record is barren as to any confusion between the names "Quaker State" and "Quaker City." Such being the case, the complainant contends that it now has the right to use "Quaker" exclusively as well as "Quaker State," and asks the court to restrain all who use a trade name similar to "Quaker" as well as those who use a name similar to "Quaker State." This argument is inapplicable to the facts in the case for one reason and possibly for two. First, there is no evidence that the complainant's oil was called "Quaker" in 1919, when the defendant started in business. Hence it cannot be said that the defendant violated any rights of the complainant at that time. The fact that the public afterwards began to call the complainant's product "Quaker" should not be permitted to divest the defendants of any rights already acquired. Second, this same argument was raised in *Loughran v. Quaker City Chocolate & Confectionery Co.*, supra, and the court dismissed it, saying (p. 826) : "But the unusual thing about the opposition of the defendant is that its complaint does not extend so much to a claimed deceptive similarity between the contesting trade-marks as it does to its claimed right, previously stated, to take out of its trade-marks the catch word 'Quaker' and use it in its business generally—and exclusively. The defendant maintains that it has used the word 'Quaker' disenjoined from the word 'City' and has applied it to advertising, wrapping, boxing and selling its candies so long that its candies have become known to the public by this single word and therefore the registration of the plaintiffs' trademark of 'Quaker Maid,' though accompanied with a

representation of a Quaker woman, would carry to the trade the idea that the plaintiffs' candies are made by the defendant. This conclusion is only true if the defendant were entitled to the exclusive use of the word 'Quaker.' We cannot see what right it has to appropriate and make claim to the exclusive use of one of several trade-mark words. 'Quaker City,' the name by which the City of Philadelphia is popularly known, is a name freely used by a multitude of tradesmen, as an inspection of the telephone directory of that city will abundantly show. The registration of a trade-mark does not give the registrant a monopoly of every word in the trade-mark, however, disposed and used." This same thought is tersely stated by Judge JESSELL in *Cowen v. Hulton*, 46 L. T. R. (N. S.) 897: "He has a right to the name by which he sells his paper, but not the name by which people chose to call it." See also *Evening Journal Asso. v. Jersey Pub. Co.*, 96 N. J. Eq. 54, 124 A. 767, where the court held that confusion resulting from the use of the short term "Jersey" is not ground for relief.

In *Caron Corporation v. Conde*, 126 Misc. (N. Y.) 676, 677, 213 N. Y. S. 735, affirmed 220 App. Div. 835, 222 N. Y. S. 782, it was said: "The plaintiff does not use the word 'narcissus,' but the words 'narcisse noir,' namely 'black narcissus.' In mathematics it may be true that a whole is equal to the sum of all its parts, and, conversely, that each part is equal to its proportion of the whole. No such principle, however, can be applied to the use of a combination of words or phrases in the field of the law of unfair competition. A phrase or combination of words may be entitled to absolute protection, while the use of its component parts separately may be open to every one. Assuming that plaintiff is entitled to the sole use of the phrase 'black narcissus' or any colorable imitation thereof, it by no means follows that he has any right to prevent the use of the word 'narcissus' alone."

In any event there is no evidence that the public called the complainant's product "Quaker" in 1919 and hence for this reason the argument should not be given effect. This conclusion is supported by *Bayuk Cigars, Inc. v. Schwartz,* 1 F. Supp. 283, involving the right to use the nickname "Phillies" as applied to cigars.

The testimony discloses that another company located in Indiana adopted the name "Quaker" for its oils two years before the plaintiff's earliest use of the designation, so that it could not be said that plaintiff had exclusively used the name. See *Columbia Mill Co. v. Alcorn,* 150 U. S. 460.

If it had been shown that the defendants were endeavoring to palm off their product as plaintiff's, a different situation would exist and relief would be granted. Nothing of that kind was attempted to be established. All that appeared was that occasionally some purchaser did not differentiate between "Quaker State" and "Quaker City" when inquiring for or purchasing oil. These two concerns can if good faith is maintained continue to sell their respective oils as they have in the past. If defendants should endeavor to foist their oil on those who desire that of plaintiff by misrepresenting what it really is, relief can be granted against such unfair trade methods.

The decree is affirmed at appellant's cost.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

The majority opinion says: "The defendant can only be enjoined from the use of the name 'Quaker City' if it is deceptively similar [i. e., if it is similar to 'Quaker State']." I think the words "Quaker City" *are* deceptively similar to "Quaker State." I cannot agree with the statement that "there is nothing in the names 'Quaker State' and 'Quaker City' that should confuse the purchasing public." The impressive word in both of these phrases is "Quaker." The human mind so functions that its attention is concentrated on *one* word of

any title or descriptive phrase. The average observer would either not note the difference between the phrases Quaker State and Quaker City or he would think that *both* oils were marketed by the same company and probably taken out of the subterranean caverns of Pennsylvania, which are generally known to yield oil of superior quality. Under the decree handed down by the majority, I see no reason why *any* person or company cannot now market without restraint an oil called "Quaker Town Oil" or "Quaker Borough Oil" or "Quaker Nation Oil."

Even when two proper nouns are linked together in a name, as, for example, "Waldorf-Astoria," one of the nouns soon becomes dominant and the public refers to the designated thing by its dominant name. People generally now refer to the "Waldorf-Astoria" as the "Waldorf." This one-word dominance is more pronounced when a proper noun is linked with a common noun as a designation. If some one produced and marketed cotton designated as "Missisippi Valley Cotton," it would soon become known as "Mississippi Cotton," and if, after it had secured a valuable reputation, another would market cotton and call it "Mississippi River Cotton," the latter name would be well calculated to deceive purchasers.[1]

In *Scranton Stove Works v. Clark et al.,* 255 Pa. 23, 99 A. 170, this court, in an opinion by the late Chief

---

[1] It was said in 8 Michigan Law Review (1910), page 613, in an article on "The Unwary Purchaser": "The person to be considered, the courts say is not . . . the expert or the careful person, but the normal, every day purchaser, or, as some judges have designated him, . . . the inattentive purchaser, . . . or the unwary purchaser. . . . He is likely in making his purchase to act on the moment and is not bound to study or reflect. . . . He is not supposed to know that imitations exist. . . . Some courts have gone so far as to hold that he has a right to be careless and that the use of a mark or label will be enjoined where deception is a probable or even a possible consequence."

See also *Coca-Cola Co. v. Chero-Cola Co.,* 273 Fed. 755, where the Court of Appeals of the District of Columbia, said: "The prospective purchaser . . . acts quickly. He is governed by a general glance. The law does not require more of him."

Justice FRAZER, said: "To constitute an infringement of a trade-mark a literal copy is not necessary. The test is whether the label or mark is calculated to deceive the public and lead them to suppose they are purchasing an article manufactured by a person other than the one offering it for sale: *Pratt's App.*, 117 Pa. 401 [11 A. 878]. The same principles apply to unfair trade competition. 'The general rule is that anything done by a rival in the same business by imitation or otherwise, designed or calculated to mislead the public in the belief that in buying the product, offered by him for sale, they were buying the product of another's manufacture, would be in fraud on that other's rights and would afford just ground for equitable interference': *Juan F. Portuondo Cigar Mfg. Co. v. Vicente Portuondo Cigar Mfg. Co.*, 222 Pa. 116, 132 [70 A. 968]. A fraudulent intent in such cases need not always be shown."

In *American Clay Mfg. Co., a corporation of Penna., v. American Clay Mfg. Co., a corporation of N. J.,* 198 Pa. 189, 47 A. 936, this court, in an opinion by Mr. Justice MITCHELL, said: "There are two classes of cases involving judicial interference with the use of names, first, where the intent is to get an unfair and fraudulent share of another's business, and, second, where the effect of defendant's action, irrespective of his intent, is to produce confusion in the public mind and consequent loss to the complainant. In both cases the courts of equity administer relief without regard to the existence of a technical trade-mark." Justice MITCHELL cites the case of *North Cheshire & Manchester Brewery Co. v. Manchester Brewery Co.,* Law Reps. App. Cases (1899), 83. In that case the House of Lords affirmed the decision of the Court of Appeal, enjoining the defendant from taking even as a *second* or *subordinate* part of its corporate title, the name of an older corporation. Justice MITCHELL said: "It was held that as a matter of fact the name of the appellant company was calculated to deceive, and that the appellant must, therefore, be re-

strained by injunction in the usual way. HALSBURY, Lord Chancellor, said, 'The real question is in a single sentence. *Is this name so nearly resembling the name of another firm as to be likely to deceive?'* " (Italics supplied.) Justice MITCHELL also cites the case of *Holmes, Booth & Haydens v. Holmes, Booth & Atwood Mfg. Co.,* 37 Conn. 278. He says: "A company had been formed including in its corporate title the names of Holmes and Booth, two of its stockholders and directors. Some years later, Holmes, Booth and other stockholders formed a new corporation which assumed the name of Holmes, Booth & Atwood Mfg. Co. On a bill by the first corporation the Supreme Court of Errors of Connecticut enjoined the use of Holmes and Booth's names in the title."

In the case of *A. Hollander & Son, Inc., v. Jos. Hollander, Inc., et al.,* 175 A. 628 (1934), the Court of Chancery of New Jersey, enjoined the defendant corporation and Joseph Hollander from using the name 'Hollander' either as one or as a component part of any trade name in the business of dressing and dyeing furs. In that case the court said: "It is not necessary that the complainant, in order to succeed, should prove actual fraud by the defendant, or that any single person was deceived. It is sufficient if, in the opinion of the judge, the symbol or device or get-up used by the defendant is one which so closely resembles the symbol, device or get-up used by the complainant as to be likely to deceive the public. . . . The idea that a man has a right to use his name as a part of the name of a corporation in which he is interested, without regard to the effect of such use in the way of accomplishing deception and fraud, precisely as a natural person can use his own name, has, I think, in this state, been exploded. . . . The corporate defendant will be restrained from using in its fur dressing and dyeing business its corporate name or any other name of which 'Hollander' is a component part, and this without any qualification. To permit the corporate defendant to use the name 'Hollander' in its business, even if

limited to the trade, would expose the complainant to the risk of the very injury it complains of, viz., the deception or confusion of the buying public concerning the identity of the defendant's product." In *McLean v. Fleming,* 96 U. S. 245, 24 L. Ed. 828, complainant who marketed "McLane's Liver Pill" procured an injunction against respondent who marketed his pills under the name, "Dr. McLean's Universal Pills." In that case the respondent pleaded laches and it was held by the Supreme Court that acquiescence of long standing was no bar to an injunction against respondent but did not entitle complainant to an account nor to a decree for gains or profits.

In *Quaker City Chocolate & Confectionary Co., Inc., v. Kernan,* 278 Fed. Rep. 592, which was a trade-mark case, the Court of Appeals of the District of Columbia held that the plaintiff's objection to the defendant's use of the words "Quaker Maid" as a trade-mark for candy was well taken. The court said: "The goods on which the respective marks are used are the same and would undoubtedly be known to the trade as "Quaker Candy."

The Third Circuit Court of Appeals, 84 Fed. (2d) 387 (1936), enjoined Bernett & Rosenfeld, who registered their drug store in Philadelphia as "Macy's Drug Store" under the Fictitious Names Act, from using the name "Macy." The court said that the use of the word "Macy's" "was intended to and had a tendency to mislead and deceive the public into the belief that the defendant's business was connected with that of the plaintiff. . . . There was a palpable attempt to make use of the plaintiff's reputation and good will acquired through many years of advertising and appropriate it to the benefit of the defendants and deceive the public."

The Circuit Court of Appeals (10th Circuit), 56 Fed. Rep. (2nd), 973, (1932), enjoined the Standard Oil Co. of New Mexico, Inc.; at the suit of the Standard Oil Co. of California, from using any corporate name which contains the words "Standard Oil Company" or

words so similar thereto in sound or appearance as to lead to confusion or uncertainty. The court said: "With a practically unlimited field of distinctive names open to it for choice, defendant selected the name 'Standard Oil Company.' It could have had but one object, namely, to improperly obtain advantage of the good-will associated with the name 'Standard Oil' and to take and commercially use as its own a commercial asset that belongs to another, to the detriment of that other and the public."

Even if "Quaker State" be considered a geographical name (which it is only in a seldom used colloquial sense), plaintiffs are no less entitled to protection in its use after they by advertising and marketing their product under that name have given it great commercial value than they would be if they had invented the name. The hesitancy which some courts in an earlier day manifested in protecting commercially used geographical names now seems to be disappearing. Many names originally geographical are now as well known commercially as they are geographically and their commercial use has frequently received judicial protection. In *Elgin Nat. Watch Co. v. Illinois Watch Case Co.*, 179 U. S. 665, the Supreme Court of the United States, in an opinion by Chief Justice FULLER, held: "It is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached. In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those, and other, goods;

and protection is accorded against unfair dealing, whether there be a technical trademark or not."

I cannot agree with the statement in the majority opinion that the words "Quaker State Oil" did not acquire a secondary meaning until after 1919. The majority opinion concedes that plaintiff's "Quaker State Oil" had "been marketed and nationally advertised for five years [prior to 1919] under this name." That is surely enough to entitle plaintiff to protection against anyone using the same or a similar name after plaintiff had so nationally advertised its product. Any name, geographical or otherwise, as applied to a product, becomes an asset of the person who advertises and markets that product as soon as the public begin to associate that name with that product.

In *American Waltham Watch Co. v. U. S. Watch Co.,* 173 Mass. 85, 53 N. E. 141, Mr. Justice HOLMES, speaking for the Supreme Judicial Court of Massachusetts, enjoined the defendant from using the name "Waltham Watch" and said: "The plaintiff was the first manufacturer of watches in Waltham, and had acquired a great reputation before the defendant began to do business. . . . The name of a person may become so associated with his goods that one of the same name coming into the business later will not be allowed to use even his own name without distinguishing his wares. *Brinsmead v. Brinsmead,* 13 Times Law R. 3. . . . And so, we doubt not, may a geographical name acquire a similar association with a similar effect. Whatever might have been the doubts some years ago, we think that now it is pretty well settled that the plaintiff, merely *on the strength of having been first in the field* [italics supplied], may put later comers to the trouble of taking such reasonable precautions as are commercially practicable to prevent their lawful names and advertisements from deceitfully diverting the plaintiff's custom."

In an article entitled "Trade-Marks and Trade Names," 30 Columbia Law Review (1930), page 192, it is said: "A geographical term may be used to indicate the place of manufacture, e. g., that watches are manufactured at Waltham, Mass. It may come to signify a particular quality, e. g., Minneapolis flour, Rochester clothing. It may in time represent a special process, e. g., Budweiser beer. Finally, it may be used to designate the source or origin of a particular product, e. g., Elgin watches, Vienna bread. . . . The statement that geographical names cannot be valid trademarks is obviously too broad. . . . Why should not the person who added a new meaning to words previously signifying place, grade, or quality have the 'exclusive right' to use them in this acquired sense? . . . For present purposes, it is a matter of indifference whether geographical names are regarded as trademarks or trade names so long as they are as adequately protected against piracy as the Waltham mark [in *American Waltham Watch Co. v. U. S. Watch Co.,* supra]. No mark, no matter how fanciful or unique, would receive greater protection. The *Waltham* case does not stand alone. In both the *Glenfield Starch* and *Stone Ale* cases, two famous English authorities, absolute injunctions were granted. In view of the broad relief given in these early cases, it is surprising that the notion should ever have developed that geographical names cannot be trade-marks."

In *Columbia Grammar School v. Clawson,* 200 N. Y. Supp. 768, the use of the name "Columbia" in connection with the words "Preparatory School" was enjoined at the instance of the plaintiff which had been using the name "Columbia Grammar School." The court said: "Defendant's claim that patriotic considerations should give the right to any one so choosing to use the word 'Columbia' without restriction seems to have been determined adversely to that contention in

the case of *People ex rel. Columbia Chemical Co. v. O'Brien,* 101 App. Div. 296, 91 N. Y. Supp. 649."

In *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U. S. 251, the Supreme Court of the United States held that defendant was guilty of unfair competition in marketing its shoe under the trade-mark "American Lady" after the plaintiff had marketed its shoe under the trade-mark "American Girl." The court said: "We are convinced that it [the phrase "American Girl"] was subject to appropriation for that purpose [i. e., to designate shoes of plaintiff's manufacture]." In *Fairbank Co. v. Luckel King & Cake Soap Co.,* 102 Fed. 327, it was held that the use of the words "Gold Drop," where a prior company had used the words "Gold Dust" as applied to washing powder, was unfair competition and a trespass on plaintiff's good will. The court said that the plaintiff was "entitled to an injunction, irrespective of the question of any testimony as to actual fraud or willful intent."

There is no reason why an oil company cannot be as fully protected in the use of a geographical name as are hotel and railroad companies. Many of the latter bear geographical names, notably the Pennsylvania Railroad and the Baltimore & Ohio Railroad.

Plaintiff by the expenditure of millions of dollars has affixed the name "Quaker State" in the public mind as being an oil marketed by it and presumably refined, at least in part, from Pennsylvania crude oil. The distinctive, "catchy" part of that name is the word "Quaker." By *defendants* calling *their* oil "Quaker City Oil," public deception is clearly invited. The defendant-partnership's own fictitious trade name is not "Quaker City" but "Pennsylvania Petroleum Products Company." They began to market their oil, which certainly is *not* produced from "Quaker City" oil wells, only after the plaintiff, which bears the name "Quaker State Oil Refining Company" had nationally advertised "Quaker State Oil" for four years and had acquired

for such oil a large and constantly expanding market.

The majority opinion says: "The testimony discloses that another company located in Indiana adopted the name 'Quaker' for its oils two years before the plaintiff's earliest use of the designation, so that it could not be said that plaintiff had exclusively used the name." I think the answer to that is twofold: (1) the present plaintiff in a suit captioned *Quaker Oil Co., Inc.* [the Indiana Company] v. *Quaker State Oil Refining Co.,* 74 Fed. (2) 553, successfully opposed the registration of the word "Quaker" by the Indiana Company. In that case the court said: "It appears from the record that appellee's [Quaker State Oil Refining Company] trade-marks ["Quaker State Medium," "QSM," and "Quaker State"] have been in continuous use by appellee and its predecessor since July 31, 1914, . . . that appellee's lubricating oils and greases are generally referred to by the term 'Quaker'; that appellee had utilized practically every available means in advertising its trade-marks and its lubricating motor oils throughout the United States and Canada, . . .; that it has expended more than $2,000,000 in such advertising; and that it has sold its lubricating motor oils under its trade-marks throughout the United States and Canada." Registration of the word or mark "Quaker" by the Quaker Oil Company of Indiana was denied on the ground that it had not shown any use of the word "Quaker" prior to the use of that word by the Quaker State Oil Refining Co. The second answer is that it is immaterial to the issue in the instant case whether the Indiana Company had used the word "Quaker" to designate its oil before the plaintiff had so used that word. The present controversy is not between the present plaintiff and the Indiana Company. If it were and the Indiana Company could show that it had used the word "Quaker" to identify the oil it advertised and marketed in a certain territory, before the present plaintiff had advertised and marketed its oil in that same

territory, it could justly demand the protection the plaintiff now asks for in this case against the defendant. It might well happen that two different corporations or individuals might begin to use in widely separated parts of the country the same trade name to designate the same kind of a product and at about the same time or otherwise. In such a case the right of each to its own territory would doubtless be judicially recognized. For example, in *American Radio Stores, Inc., v. American Radio & Television Stores Corp.*, 150 Atl. 180 (1930), the defendant was "enjoined from using as part of its corporate name the word "American" in the territory where the complainant does business and in territory competitively contiguous thereto which is reached by the complainant's trade and solicited by the complainant's advertisements." As Justice HOLMES said in *American Waltham Watch Co. v. U. S. Watch Co.* (supra) : "In cases of this sort, as in so many others, what ultimately is to be worked out is a point or line between conflicting claims, each of which has meritorious grounds, and would be extended further were it not for the other." Whatever may be the respective rights of the plaintiff and the Indiana Company, they have no bearing on the issue here, that issue being the right of the defendant to use the name "Quaker City" to designate its oil in territory admittedly commercially occupied by plaintiff's "Quaker State Oil" before the defendant or any other company using the name "Quaker" to designate an oil had entered that territory as a competitor.

The chancellor of the court below found—and these findings were not even excepted to—inter alia, as follows: "9. Plaintiff spent about $650,000 for advertising in the year 1934; and plaintiff and its predecessors have expended $8,000,000 to $10,000,000 in advertising 'Quaker State' oils and in bringing its trade name, 'Quaker State,' to the knowledge of the public and have spent approximately $15,000,000 to $18,000,000 in es-

tablishing 70,000 dealers. The latter figure includes a portion of the advertising expense. 10. A valuable good will in the business of marketing motor oil under the trade name 'Quaker State' has been built up; the volume of business done by plaintiff in the sale of 'Quaker State' motor oil is large and in the year 1930 aggregated 18,000,000 gallons thereof."

I agree with the chancellor's 11th, 12th and 13th conclusions of law (as well as his other conclusions) reached as follows: "11. Under all the testimony the plaintiff is entitled as against the defendants to the sole use of the word 'Quaker' when applied to and used as a name for motor oil. 12. Plaintiff's interest in its good will, in the name of its merchandise, in its trade name and in the reputation of its business is property which a court of equity will protect from destruction or injury. 13. The money expended by plaintiff in advertising and sales promotion and the public demand for its product and the reputation of its oil for uniformity are good will and constitute property. The effect and tendency of the conduct of the defendant is to injure or destroy that property." [2]

---

[2] In an article on "Pre-emption in Connection with Unfair Trade," in the Columbia Law Review, Vol. 19, page 29, Lord Justice GIFFORD is quoted as saying: "It is a fraud on a person who has established a trade and carries it on under a given name, that some other person should assume the same name, or the same name with a *slight alteration* [italics supplied] in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the same. See *Lee v. Haley* (1870), L. R. 5 Ch. 155, 160." The same article says (p. 45): "Nor does it matter that there are minor differences, and an imitation which is not exact. 'All that,' aptly said LEARNED HAND, J., 'is almost a convention, when you appropriate another man's mark; for there must be some color of good faith, some defense to put forward. Minor differences are supposed to help over hard places': *Stamford Foundry Co. v. Thatcher Furnace Co.,* 200 Fed. 324. In such matters the court is under a very lively obligation to use its common sense. . . . The good will built up by the successful production of one article . . . is entitled to protection from anything that will hurt it, directly or by reaction."

I do not think the court below was justified in vacating the chancellor's decree nisi.  I would therefore reverse the decree of the court below and decide this case as the chancellor decided it.