# Henry v. Fischer

*Frank R. Hean* and *Metzger & Wickersham,* for plaintiff.

*Joseph Nissley* and *Braddock & Sohn,* for respondent.

HARGEST, P. J., January 12, 1948.—This case comes before us upon a bill in equity praying for an injunction.

A preliminary injunction was issued January 31, 1946, and, upon agreement of counsel was revoked February 2, 1946, and a rule on defendant issued to show cause why a preliminary injunction should not issue. An answer was filed to that rule, but no answer was filed to the bill. The matter now comes before us after testimony taken.

### Averments of the bill

The bill avers that Paul T. Henry, plaintiff, since 1940, and up to the time of the filing of the bill, published a booklet entitled "Henry's Handy Annual Railroad Men's Time Record Book," eastern rate area, for engine and train service men, including car retarder

operators, switch tenders and hump motor car operators; that the publication was a private enterprise, for which plaintiff and his agents solicited advertisements and gave receipts therefor to the amount, for the year ensuing after July 1, 1945, of $3,000; that the booklet was an expression of the author's idea, and the composition thereof for the year 1944 was copyrighted; that the schedule of rates contained in the booklet was compiled by a certified public accountant and petitioner paid the expense of such work; that defendant was an agent of petitioner and solicited advertising for said booklet during the year 1945, and also solicited, on or after July 1, 1945, advertisements for a booklet whose title is deceptively similar to the plaintiff's booklet, to wit, "The Handy Annual Railroader's Time Book"; that in soliciting advertisements for the latter book defendant displayed a copy of plaintiff's book to numerous advertisers who had for years advertised in plaintiff's book, and secured the advertisements by leading the advertisers to believe that they were continuing the advertisement in plaintiff's book, and had collected money from various advertisers for their advertisements to appear in the forthcoming book by defendant to the amount of $3,000 or more; that defendant intended to print such "Handy Annual Railroader's Time Book" on or about July 1, 1946; that plaintiff had established, by reason of past years of publication of his time record book, a reputation among a large number of persons for publishing a reliable and largely-distributed time record book; and avers that defendant, in adopting the name, shape, and arranging the advertisements, confused and deceived the advertisers of plaintiff's book and prevented plaintiff from obtaining the advertisements which he was accustomed to get, to the irreparable damage of plaintiff.

The bill prayed for an injunction preventing defendant from using a deceptive title for his record book and enjoining defendant and his servants from solicit-

ing advertisements to be inserted in a time record book to be published similar to that of plaintiff.

## Facts

We have answered and filed of record the requests for findings of fact, but herewith make our own.

1. Plaintiff, for the last six years prior to 1945, published and distributed a railroader's time book in Harrisburg, Pa., known as "Henry's Handy Annual Railroad Men's Time Record Book", which consisted of ruled pages on which the railroader may enter and compute his time and wages, and also schedules of rates and hourly pay.

2. There was no similar book published in Harrisburg and vicinity prior to plaintiff's publication.

3. Plaintiff copyrighted the time book for the year 1944 but not thereafter.

4. In February 1945 plaintiff employed defendant as a collector in the business of publishing plaintiff's book. Defendant's duties were to see those who had already been solicited for advertisements and to secure the advertising copy and collect the money for the advertisement, and to give the advertisers a receipt. Defendant continued those duties until May 1945, when he was assigned to become a solicitor to sell advertising space in plaintiff's book, either by personal call or by telephone communication to respective advertisers. Defendant continued from May 1945 until October 1945, as a solicitor for plaintiff.

5. In October 1945 defendant was discharged, and, in partnership with one Richard Folk, went to Port Jervis, New York, and Mauch Chunk, Pa., where they solicited, and, in 1946, published a railroader's time book, which books did not contain a pay schedule such as was included in the Henry book.

6. Plaintiff reëmployed Fischer as a solicitor in January 1946, at the time Henry was handling the publication for the Dauphin County Firemen's Association. While thus working for Henry, Fischer was at

the same time soliciting advertisements for publication in his own railroader's time book, and, in so soliciting them by telephone, in some cases, used a name other than his own for his Harrisburg book. In the latter part of January 1946 the situation came to the attention of Henry, who then immediately discharged Fischer.

7. Defendant, in soliciting and publishing his Harrisburg book, used contracts, receipts, and technique substantially similar to plaintiff's contracts, receipts and technique. Plaintiff had obtained his advertisers in his book for the first year by personal solicitation, and in subsequent years obtained renewals by solicitations by telephone.

8. As a result of defendant's contact with plaintiff's customers and advertisers, about 70 percent of them were misled, and gave their subscriptions to defendant, thinking that they were either dealing with Henry or were renewing the advertisements in Henry's previous publications.

9. The receipts used by Fischer were substantially similar to those previously used by Henry.

10. When the time came for the publication of Henry's 1945 book for Harrisburg and vicinity, Henry left for the Pacific Coast and put Fischer in charge, and gave Fischer the responsibility of having the 1945 book printed and to use the same cover as in the previous book, but, in violation of the instructions, Fischer changed the cover of Henry's 1945 book.

11. Many of the advertisements in plaintiff's and defendant's books are exactly similar. There is a great similarity between plaintiff's and defendant's 1945 books, particularly as to the outside of the front and back covers. The size of the books is exactly the same. Plaintiff's book, prepared under the direction of defendant, contains a pink color while defendant's book has a brown cover. Plaintiff's book has in small letters "Henry's Handy Annual Railroad Men's," and in large

letters "TIME RECORD BOOK". And, below, in small letters "For Engine and Train Service Men, Including Car Retarder Operators, Switch Tenders and Hump Motor Car Operators". Defendant's book has in large letters "RAILROADERS TIME BOOK". Plaintiff's book, underneath what is hereinabove indicated, has "Harrisburg, Pa. & Vicinity". Defendant's book has "Harrisburg & Vicinity". In a block in the center of plaintiff's book appears "Compliments of Harrisburg Lodge Loyal Order of Moose, 225 State Street"; and exactly the same words appear on the bottom of defendant's book, but not in the center. On the bottom of plaintiff's book appears "The Finest! ZELLER'S Superior Potato Chips"; and exactly the same words appear in the center of defendant's book.

12. On the back of defendant's book is precisely the same advertisement for Graupner's Beers and Ale, not only in the exact language but with type and spacing similar.

13. About four fifths of the advertisers in defendant's book had been advertisers in Henry's 1945 book, and about one fifth of defendant's advertisers were not advertisers in Henry's book. There are 41 advertisements in which the phraseology in defendant's book is exactly the same as that in plaintiff's book for 1945, and the type similar. As a result of defendant's actions, plaintiff has lost about 70 percent of his Harrisburg advertisements.

14. As an illustration of defendant's methods:

(a) R. H. Stetler, of the Evangelical Press, knew Henry and had advertised in his book for several years. He was called by defendant or defendant's agent over the phone and solicited for the renewal of the previous advertising, in such a way as to indicate that the solicitation involved a renewal of the ad carried by the Evangelical Press in the Henry book. Mr. Stetler, acting for the Evangelical Press, gave him the ad, but

would not have done so if he had known that it was not for Henry's book but for a new publication.

(b)  Defendant's solicitor, who solicited the Hoover Furniture Company for their advertisement, which company has advertised in plaintiff's book, showed Robert E. P. Hoover, Jr., an ad that had not been changed for three years, and asked: "Would you like to run this ad again?" The Hoover Company assumed that they were readvertising in plaintiff's book, and otherwise would not have advertised in defendant's book.

15.  Five hundred copies of plaintiff's hand book were distributed free.  It is more complete than defendant's book, and contains a set of tables prepared by Walter F. Kuhn, an accountant, which is not found in defendant's book.

16.  Defendant Fischer admits that during the time that he was employed by Henry in January 1946 his, Fischer's, agents were soliciting ads for his book to be published in competition with Henry's book.

17.  Fischer's time book was published about March 1, 1946.  Henry was able to publish his time book for 1946, but, because of the circumstances, it came out later than scheduled, which was sometime in September 1946.

18.  Fischer's time book and the receipts which he used were, and were intended to be, similar to Henry's book and receipts, although on a different colored paper.  The Fischer book was deceptively similar.

### Question involved

Did defendant solicit advertisements for his time-book and print his book in such a manner as to amount to unfair competition?

### Discussion

There is some evidence of copyright in this case, but it does not concern any question of copyright infringement, nor are we predicating anything upon copyright.

There is also some evidence of competition in other places, but we are limiting our decision to what occurred in the Harrisburg area with reference to the publication of the Harrisburg books.

The question before us is whether defendant solicited his advertisements in such a manner as to amount to unfair competition.

In Waring v. WDAS Station, Inc., 327 Pa. 433, it it held:

"The question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business."

And it is said, page 452:

". . . generally speaking, the doctrine of unfair competition rests upon the practice of fraud or deception, the presence of such elements is not an indispensable condition for equitable relief, but, under certain circumstances, equity will protect an unfair appropriation of the product of another's labor or talent. (Citing International News Service v. Associated Press, 248 U.S. 215)."

If the effect of a defendant's action, irrespective of his intent, is to produce confusion in the public mind, and consequent loss to plaintiff, equity will interfere, and more so where there is evidence of an intent to get an unfair advantage or a fraudulent share of plaintiff's business.

In Potter v. Osgood, 79 Pa. Superior Ct. 397, Judge Keller, quoting from Higgins Company v. Higgins Soap Company, 144 N. Y. 462, 39 N. E. 490, said:

" 'It is well settled that an exclusive right may be acquired in the name in which a business has been carried on, whether the name of a partnership or of an individual, and it will be protected against infringement by another who assumes it for the purpose of deception, or even when innocently used, without right, to the detriment of another.' "

In Juan F. Portuondo Cigar Mfg. Co. v. Vincente Portuondo Cigar Mfg. Co., 222 Pa. 116, 132, it is said:

". . . The general rule is that anything done by a rival in the same business by imitation or otherwise, designed or calculated to mislead the public in the belief that in buying the product offered by him for sale, they were buying the product of another's manufacture, would be in fraud on that other's rights, and would afford just ground for equitable interference."

We might cite a multitude of cases to sustain these principles, a few of which are American Clay Mfg. Co. v. American Clay Mfg. Co., 198 Pa. 189, Hartman v. Cohn et al., 350 Pa. 41, Dewees et al. v. Schneider, 333 Pa. 401, Thomson-Porcelite Co. v. Harad et al., 356 Pa. 121, and J. S. Ogilvie Publishing Co. v. Royal Publishing Co., 241 Pa. 5.

In Quaker State Oil Ref. Co. v. Steinberg et al., 325 Pa. 273, it is said, page 277 et seq.:

"It is clear under the best considered authorities that a purely descriptive term such as a geographical one cannot be exclusively appropriated by anyone. . . .

"If, however, the geographical term has taken on a secondary meaning it will be protected. . . . (Quoting from Merriam Co. v. Saalfield, 198 Fed. 369, 373, the Court said) : 'This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the "secondary meaning" theory. . . . It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to

his article, that in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, "secondary meaning," seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning. Here, then, is presented a conflict of right. The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud.' 'Secondary meaning is association, nothing more. It exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds.' "

In the instant case we think defendant, from the facts which we have found, has violated all of the foregoing principles. He used a deceptive name to which plaintiff had acquired a secondary meaning by previous publication. He deceived plaintiff's customers in securing, for his own publication, advertisements which the customers thought they were giving to plaintiff. He used deceptive receipts which were, in language and arrangement, similar to those used by plaintiff, and in form exactly identical.

For these reasons we think plaintiff is entitled to prevail.

Defendant has perpetrated a fraud in the publication of the one book for one year, and plaintiff is entitled to prevent, by injunction, the recurrence of that wrong.

Plaintiff, however, claims damage for the injury done. He makes a vague estimate that his loss of good will was $1,500, but he has fallen far short of submitting evidence from which the court can ascertain any actual damage, either from the loss of advertisement or from which the court can find a definite amount of loss of good will.

Therefore, notwithstanding his remedy in equity is complete and damages in cases of this kind may issue along with an injunction, we are without evidence from which we can find specific amounts of damages.

### Conclusions of law

1. Defendant and his employes acted illegally and unfairly in soliciting advertisements from plaintiff's customers in such a way as to create the impression with plaintiff's customers that they were, in fact, renewing subscriptions for the advertisement previously carried in plaintiff's hand book.

2. Defendant acted unfairly and illegally in using the knowledge of plaintiff's customers, of plaintiff's business methods, and of the technique which plaintiff employed, which defendant had obtained while in plaintiff's employ, to secure for himself advertisements which he deceptively allowed plaintiff's customers to believe were for plaintiff's book.

3. Defendant acted unfairly and illegally in securing advertisement in publishing The Railroaders Time Book, deceptively similar to plaintiff's time book.

And now, January 12, 1948, the prothonotary is hereby directed to enter the following decree nisi, and give notice to the parties or their counsel of record of the entry of the decree.

### Decree nisi

It is hereby ordered and decreed:

36

(1)  That a final injunction issue enjoining and restraining defendant, his servants and agents, from using a title for a record time book which is deceptively similar to the copyrighted title of Henry's Handy Annual Railroad Men's Time Record Book.

(2)  That defendant, his servants and agents, are perpetually enjoined from soliciting advertisements to be inserted in such deceptive time book, and from using the deceptive forms of receipts which plaintiff has heretofore used.

(3)  That defendant pay the costs of this proceeding.