## Jessar Manufacturing Corporation *v.* Berlin, Appellant.

Argued November 19, 1954.   Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

454

*Harry Langsam,* with him *Simon Shapiro,* for appellants.

*Sylvan M. Cohen,* with him *Louis Samuel Fine* and *Cohen & Cohen,* for appellee.

OPINION BY MR. JUSTICE BELL, January 6, 1955:

Plaintiff sought and obtained a decree in equity restraining defendants from manufacturing and selling baby auto seats which had a horse's head on the front and reins for the child to hold.

Plaintiff is a manufacturer of baby auto seats and other toys. Early in 1954 it brought out and marketed the above-described baby auto seats. Defendants copied this product and marketed it *under their own name,* which was in no way similar to plaintiff's name, claiming they had a legal right to do so, since plaintiff's invention was not patented and had not acquired a special or secondary meaning. The Chancellor found that defendant's actions amounted to unfair competition and issued a preliminary injunction.

At first blush it seems shocking that any person can copy or imitate an article made, manufactured or sold by another. However, on analysis it is clear that

copying the ideas and unpatented commercial articles of others has contributed tremendously to the progress and prosperity of the United States and is in the best interest of the vast majority of the people, since it restricts monopoly and enables the people to purchase useful or necessary articles at low competitive prices. Moreover, the manufacturer of an article of general use, or the inventor of a trade-mark or a trade name is not without protection. He can have his article, trade-mark or trade name patented or copyrighted, in which event he will be protected against infringement; furthermore, he can and will be protected if his article, trade-mark or trade name has acquired a so-called special or secondary meaning.

In this case plaintiff points out that defendants could have used a lion's head or a zebra's head or a donkey's head or any other animal's head instead of a horse's head. Why, may we ask, should plaintiff have the sole and exclusive right to the use of a horse's head or to the use of a baby seat or to the use of a combination of both of these *articles which are of such general usage* that—unless they are patented or have acquired a secondary meaning—*they rightfully belong to the general public.*

The general principles dealing with trade names and trade-marks have recently been considered by this Court in *Peters v. Machikas,* 378 Pa. 52, 105 A. 2d 708; *KoolVent Metal Awning Corp. v. Price,* 368 Pa. 528, 84 A. 2d 296; and in *Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa. 334, 95 A. 2d 523.

In *Peters v. Machikas,* 378 Pa., supra, upon a complaint by plaintiff trading under the fictitious name of Majestic Restaurant we reversed the Chancellor and enjoined defendants from using the trade name of Majestic Grill. The Court in its opinion said (page 58) : "In KoolVent Metal Awning Corp. v. Price, 368

Pa. 528, 84 A. 2d 296, this Court held that the trade mark 'Kool-Vent' was not infringed by the use of the name 'Cool-Ray', and said . . .: 'The law in this class of cases is well established; its application to different facts and circumstances is sometimes difficult. Descriptive, geographical and generic words, as well as words of common or general usage belong to the public and are not capable of exclusive appropriation by anyone. This general principle is subject to the limitation or exception that if a trade name or trade-mark or other word or words have acquired, in the trade and in the minds of the purchasing public, a special so-called secondary meaning, i.e., *have come to mean that the article is the product of a certain manufacturer*\* or of a particular individual or corporation, such trade name or trade-mark or word or words will be protected against infringement: Quaker State Oil v. Steinberg, 325 Pa. 273, 189 A. 473; Kellogg Co. v. National Biscuit Co., 305 U. S. 111; Thomson-Porcelite Co. v. Harad, 356 Pa. 121, 51 A. 2d 605; Stroehmann Brothers Co. v. Manbeck Baking Co., 331 Pa. 96, 200 A. 97. . . . an actual intent to deceive is not indispensable: American Clay Mfg. Co. v. American Clay Mfg. Co., 198 Pa. 189, 47 A. 936. All that is necessary is that the court shall find from the evidence that *the name* or mark or label, or the conduct and practices of the defendant *actually* confused and *deceived or that it is reasonably likely that the average purchaser will be deceived;* possibility that purchasers will be misled is not enough: Stroehmann Brothers Co. v. Manbeck Baking Co., 331 Pa. 96, 98, 200 A. 97; Thomson-Porcelite v. Harad, 356 Pa. 121, 51 A. 2d 605; Quaker State Oil v. Steinberg, 325 Pa. 273, 189 A. 473.' "

*Scranton Stove Works v. Clark,* 255 Pa. 23, 99

---

\* Italics, ours.

A. 170, is on its facts on all fours with and governs the instant case. The Court said (page 32) : "The remainder of the decree restraining defendants from selling . . . parts not made by plaintiff, whether they have or have not on them marks used by plaintiffs, without informing the purchaser they are not of plaintiff's manufacture, unnecessarily restricts defendants in the legitimate conduct of their business. There is no question of violation of patent rights involved in this case. *Consequently, it is not unlawful for defendants to imitate, and manufacture and sell as their own, an article manufactured by plaintiff.* . . . So long therefore as defendants manufacture and sell the plain castings without marks, except their own, and *without attempting to dispose of the article as a part manufactured by plaintiff,* the latter has no cause to complain."

In *Putnam Nail Co. v. Dulaney,* 140 Pa. 205, 21 A. 391, a demurrer to a bill in equity which alleged unfair competition was sustained. This case is likewise analogous to and governs the instant case. The Court said (pp. 212-213) : ". . . There is no trade-mark shown nor alleged which it is charged the defendant has pirated. On the contrary, the bill alleges that the plaintiff manufactures a peculiar kind of horse-shoe nail. It is known to the trade as a bronzed nail, being covered with a coating of bronze. It is not alleged they are any better for being bronzed, but they are more popular, and sell more readily. The bill charges that the defendant is selling *a precisely similar nail;* that it is bronzed like those of plaintiff's, to deceive purchasers and induce them to purchase them as plaintiff's nails. . . .

"We have never yet carried the doctrine of trade-marks to the extent claimed for it by the plaintiff.

---

* Italics, ours.

We have never hesitated to restrain the imitation of a trade-mark, when the facts justified it. We are now asked to go one step further, and protect the manufacture of the article itself. This we do not see our way clear to do. The manufacture of a particular article can only be protected by a patent [or where the article has acquired a secondary meaning]. The law in regard to trade-marks should not be pushed to the extent of interfering with manufactures. *A man may make any article he pleases that is not protected by a patent.* He may make a horse-shoe nail, or any other unpatented article, precisely like that of any other manufacturer; *he may imitate it so perfectly that the one may be mistaken for the other, but he may not sell his own article as and for that of another, . . . ."*

*Quaker State Oil v. Steinberg,* 325 Pa. 273, 189 A. 473, is likewise analogous in principle. In that case, this Court refused to enjoin, at the complaint of the Quaker State Oil Refining Company, the use of a trade name "Quaker City" by the defendant, Quaker City Oil Refining Company, notwithstanding the fact that the plaintiff had over 70,000 dealers handling its oil and its annual sales exceeded ten million gallons and that it had been engaged in extensive advertisement of its trade name "Quaker State" for many years. The Court said (page 276) : " '. . . the word Quaker [State] is a descriptive term not capable of exclusive appropriation by anyone and . . . it may be used by the world at large in . . . [a] non-deceptive way. . . .'

"If, however, the geographical term has taken on a secondary meaning it will be protected. . . .

"The only evidence from which it could be inferred that the name of complainant's product had acquired a secondary meaning prior to 1919 is that its product has been marketed and had been nationally advertised for five years under this name. There is no other evi-

dence from which it could be inferred that the public associated 'Quaker State' or 'Quaker' with the complainant's product at that time. 'The mere adoption and use of words in advertisements, circulars and price lists and on signs and stationery give no exclusive right to their use': Delong Hook & Eye Co. v. Hump Hairpin Mfg. Co., 297 Ill. 359, 364, 130 N.E. 765. See also Continental Corp. v. National Union Radio Corp., 67 F. (2) 938, 942. 'It is an accepted principle of the common law that mere advertising is insufficient to establish trade-mark use': Derenberg, supra, p. 505.

. . .

"*If it had been shown that the defendants were endeavoring to palm off their product as plaintiff's, a different situation would exist and relief would be granted.* Nothing of that kind was attempted to be established. All that appeared was that occasionally some purchaser did not differentiate between 'Quaker State' and 'Quaker City' when inquiring for or purchasing oil."

Another case in point is *Kellogg Co. v. National Biscuit Co.,* 305 U. S. 111. Plaintiff had been manufacturing and selling *shredded wheat* under a patent for 10 years and had spent $17,000,000. to extensively advertise it. When the patent ran out the defendant attempted to make and sell *shredded wheat* and to make it *in the same pillow-shaped form* in which plaintiff had made it for 10 years. The Supreme Court refused an injunction and in an opinion by Mr. Justice BRANDEIS said (page 116): "The plaintiff has no exclusive right to the use of the term 'Shredded Wheat' as a trade name. For that is the generic term of the article, which describes it with a fair degree of accuracy; and is the term by which the biscuit in pillow-shaped form is generally known by the public. Since the term is generic, the original maker of the product

acquired no exclusive right to use it. . . . But to establish a trade name in the term 'shredded wheat' [and hence a special or secondary meaning] the plaintiff must show more than a subordinate meaning which applies to it. *It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer.** This it has not done."

In *Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa., supra, this Court reversed the Chancellor and held that defendant's name "Goblet" for its "steinie" bottles was confusingly similar to the plaintiff's trade name "Goebel" on its like bottles. The Court said (page 342) : ". . . In Hanover Star Milling Company v. Metcalf, 240 U. S. 403, 413, the Supreme Court said,—'This essential element [i.e., "passing off" or deception] is the same in trade-mark cases as in cases of unfair competition unaccompanied with trade-mark infringement. In fact, the common law of trade-marks is but a part of the broader law of unfair competition [citing cases].' . . . In Manz v. Philadelphia Brewing Co. (D.C.E.D. Pa. 1940), 37 F. Supp. 79, 80, it was rec-- ognized that '. . . trade-names can only be protected against use or imitation on the ground of unfair competition.' . . . see B.V.D. Co. v. Kaufman & Baer Co., 272 Pa. 240, 242, 116 A. 508; Pennsylvania Central Brewing Company v. Anthracite Beer Company, 258 Pa. 45, 50, 101 A. 925; Coca-Cola Co. v. Busch, (D.C.E.D. Pa. 1942), 44 F. Supp. 405, 407. As was said in Vick Chemical Co. v. Vick Medicine Co. (D.C.S.D. Ga.), 8 F. 2d 49, 50, and quoted (a paraphrase) with approval in Winthrop Chemical Co., Inc. v. Weinberg (C.C.A. 3), 60 F. 2d 461, 463,—'the "underlying principle of law of unfair competition is to

---

* Italics, ours.

prevent substitution by deception," a principle recognized by this court in Rosenberg Bros. & Co. v. Elliott (C.C.A.), 7 F. 2d 962.' "

The text authorities are in accord.

In Restatement, Torts, Chapter 35, Topic 3, Imitation of Appearance, the law is thus stated: ". . . The privilege to engage in business and to compete with others implies a privilege to copy or imitate the physical appearance of another's goods. The public interest in competition ordinarily outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to purchasers. But the privilege to imitate may be limited by legislative enactment."

48 Corpus Juris, page 15, states: "[§2] An inventor has a natural right separate from, and independent of, any patent grant to make, use, and vend his invention, and to deprive the public of the benefits of his invention by keeping it a secret. But the making of an invention or discovery does not of itself confer upon the inventor or discoverer any exclusive right with respect to the production, use, or sale of his invention, Such rights can be acquired only by grant of a sovereign authority. Subject to the right of the inventor to be protected against disclosure or use by one who obtained knowledge through fraud or breach of faith, the public has a natural right at common law to make, use, and sell anything of which it has sufficient knowledge, and the exclusive right of an inventor in his invention is not recognized. (12)"

In 63 Corpus Juris, page 459 (1933) it is stated: "In the absence of any representation that the product is that of another, [B. V. D. Co. v. Kaufmann & Baer Co., 116 A. 508, 272 Pa. 240; Charles H. Elliott Co. v. Skillkrafters, Inc., 114 A. 488, 271 Pa. 185] an unpatented article or uncopyrighted book may be reproduced by

anyone in the precise original form and shape. [B. V. D. Co. v. Kaufmann & Baer Co., 272 Pa. 240; Elliott v. Skillkrafters, 271 Pa. 185; Putnam Nail Co. v. Dulaney, 140 Pa. 205, affirming 8 Pa. Co. 595]."

It is clear from all these authorities that if the unpatented article was not "passed off" as the goods of another, but was manufactured and sold under a name which was not like plaintiff's, there would be no unfair competition.

If we now extend the law to prohibit the copying or imitation of *an article of general use* which is not patented and has not acquired a special or secondary meaning, *what is the use of or need for our patent laws;* why all the cases which exhaustively analyze articles, trade-marks and trade names to determine whether they have acquired a special or secondary meaning? While the authorities sometimes appear to be confusing or conflicting we consider it to be in the best interests of all the people of this Country that a manufacturer or inventor should not acquire or possess an exclusive monopoly of an article he manufactures or invents unless it is protected by a patent or has acquired a so-called special or secondary meaning. Hundreds of examples will occur to everyone's mind as to what would happen if the first man who invented or manufactured an automobile or a radio or a refrigerator or a television set or washing machines or a nail or a screw driver or animal toys or baby carriages or chairs or furnaces or stoves or any one of a thousand pieces of machinery, could claim an exclusive monopoly from the mere fact that he first invented or manufactured the article even though he did not bother to have it patented or acquire a special meaning. The progress and prosperity of our Country would undoubtedly have been very greatly retarded if the first inventor or original manufacturer could successfully pre-

vent anyone from copying his unpatented invention, trade-mark or articles.

To summarize, where an article of trade (or a trade-mark or trade name) is not patented and has not acquired a so-called special or secondary meaning, it may be copied, manufactured and sold by any other person, provided it is not manufactured or sold as the inventor's product or under a name confusingly or deceptively similar to the inventor's. The gist of an action for unfair competition in such cases lies only in the confusion or deception practiced in "passing off" the goods of one for those of another.

It may not be amiss to add that whether the name used or the acts and conduct of the defendant amount to unfair competition is not a question of fact but is a conclusion of law for the appellate Court, which can draw *its own* inferences, deductions and conclusions from findings of genuine facts properly found by a Chancellor: *Peters v. Machikas,* 378 Pa., supra, page 56; *Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa., supra, page 343; *Kalyvas v. Kalyvas,* 371 Pa. 371, 375-376, 89 A. 2d 819; *Barrett v. Heiner,* 367 Pa. 510, 80 A. 2d 729; *Noonan Estate,* 361 Pa. 26, 63 A. 2d 80; *Payne v. Winters,* 366 Pa. Pa. 299, 77 A. 2d 407; *Smith v. Smith,* 364 Pa. 1, 70 A. 2d 630.

The Order of the Court below is reversed; the preliminary injunction is dissolved; the defendants' preliminary objections to the complaint are sustained and the complaint is dismissed; each party to bear its and their respective costs.